# COURT OF APPEALS,
## October, 1911.

## THE PEOPLE V. FRANK SCHERMERHORN.

(203 N. Y. 57.)

(1.) MURDER—SUFFIENCY OF INDICTMENT IN COMMON LAW FORM.

An indictment in the common law form is sufficient to sustain a conviction of murder in the first degree, even though there is no evidence of premeditation and deliberation, where the proof clearly brings the case within the statutory definition that a homicide committed by a person while engaged in the commission of a felony constitutes the crime of 'murder in the first degree.

(2.) SAME—EVIDENCE EXAMINED, AND HELD THAT CASE WAS PROPERLY SUBMITTED TO JURY TO DETERMINE IF MURDER WAS COMMITTED WHILE DEFENDANT WAS COMMITTING FELONY.

On examination of the evidence against defendant who was convicted of murder in the first degree, *held*, that the case was properly submitted to the jury to find whether it was committed while the perpetrator was engaged in the commission of the two distinct felonies of rape and burglary, since the evidence connects him with both, and discloses facts which tend to unite the two felonies as parts of one general scheme and to identify the defendant as its author and perpetrator.

(3.) SAME—CONFESSIONS.

Several separate statements in the nature of confessions were made by defendant. The question whether the last of these confessions was made under the influence of fear and hope of leniency was submitted to the jury on conflicting evidence; and the verdict necessarily implies that the confessions were fairly obtained. *Held*, that the facts disclosed by the record show that the confessions were properly admitted in evidence.

(4.) SAME—POSSESSION OF STOLEN PROPERTY AS EVIDENCE THAT DEFENDANT COMMITTED BURGLARY.

The district attorney was clearly within his rights in arguing to the jury that the defendant's unexplained possession of the stolen property was evidence which should be considered upon the question whether the defendant committed the burglary, and in the commission thereof perpetrated the murder.

APPEAL from a judgment of the Supreme Court, rendered June 22, 1910, at a Trial Term for the county of Dutchess, upon a verdict convicting the defendant of the crime of murder in the first degree.

The facts, so far as material, are stated in the opinion.

*George Wood* and *John F. Ringwood,* for appellant.

The alleged confession of defendant was obtained under threats and through promises of immunity and should have been excluded. (People v. McMahon, 15 N. Y. 384; People v. Mondon, 103 N. Y. 211; People v. Kennedy, 159 N. Y. 355; People v. O'Brien, 48 Barb. 274.) The reference made by the district attorney to the failure of the defendant to take the stand in his own behalf was clearly wrong, unfair, and against the letter and spirit of section 393 of the Code of Criminal Procedure and clearly against the established practice and constituted reversible error. (People v. McMahon, 15 N. Y. 384; People v. O'Brien, 48 Barb. 274; People v. Kennedy, 159 N. Y. 355; People v. Mondon, 103 N. Y. 211.)

*John E. Mack,* District Attorney (*Edward A. Conger* and *William A. Mulvey,* of counsel), for respondent.

The confessions were properly admitted in evidence. (People v. Rogers, 192 N. Y. 331; People v. Brasch, 193 N. Y. 46.) The comments of the district attorney in summing up were proper. (People v. Jackson, 182 N. Y. 66; Knickerbocker v. People, 43 N. Y. 177.)

WERNER, J.:

The homicide for the commission of which the defendant has been convicted was one of peculiar atrocity. The victim had been a nurse in the family of the Comptons, who lived at Mil-

brook, near Poughkeepsie. She was found dead in her bed on
the night of January 13, 1910, under circumstances which in-
dicated that she had been strangled. The autopsy which was
performed upon her body confirmed these indications and also
revealed the fact that she had been carnally outraged. Other
circumstances pointed to a burglary and larceny in the Comp-
ton residence, and still other incidents tended to identify the
defendant as the perpetrator of all of these crimes. The de-
fendant was arrested and later indicted under a presentment in
the common-law form. His trial and conviction followed in
June, 1910. The evidence against him was largely circum-
stantial, but was strongly supplemented by the defendant's
confessions which, if accepted as true, leave not a shadow of a
doubt as to the defendant's guilt. Upon this appeal the defend-
ant asserts that these confessions, received in evidence against
him at the trial, were wrung from him under circumstances
which rendered them inadmissible, and that without them the
evidence is not strong enough to support the conviction; that,
although the indictment against him was in the common-law
form, there was no evidence tending to show that the homicide
was committed with premeditation and deliberation, and that
the case was not submitted to the jury upon that theory; that
it was error to submit the case as one of murder in the first
degree upon the assumption that it was committed while the
perpetrator was engaged in the commission of the two distinct
felonies of rape and burglary, because there was no evidence
to connect the burglary with the murder. These contentions
are obviously important, for if they are well founded it must
logically follow that the defendant's conviction cannot be up-
held. It becomes our duty, therefore, to examine with critical
minuteness the cimcumstances surrounding the homicide.

At the time of the homicide the Compton family consisted
of the husband and his wife and a child about four years of
age. They employed a number of servants, among whom were

the defendant, who served as coachman; the deceased, who was nurse to the child; Ohashi, a Japanese butler, and two maids named Alice Dutcher and Mary Farrell. The defendant, a married man, lived in the coachman's house, which was something more than six hundred feet westerly of the Compton residence and on the opposite side of the highway. His wife had for some time been absent at a hospital for treatment, and he was temporarily the sole occupant of this dwelling. The deceased and the Compton child slept in an open-air apartment or porch at the westerly end of the Compton residence, and the other servants, Ohashi, Dutcher and Farrell, occupied rooms on the same floor but at the easterly end of the house, so that there was an intervening distance of about forty feet between the two places. On the night of January 12, 1910, Mr. Compton and his wife were in the city of New York. In the early evening the defendant took the maids, Alice and Mary, out for a drive and returned at about nine-thirty. The two maids entered the house, had some refreshments with the deceased and then retired. Ohashi, the butler, was then in his room. At about half-past three o'clock the next morning the maid Alice was awakened by sounds indicating that some one was trying to gain entrance to her room, and in the same instant the maid Mary screamed and said she had been awakened by a flash of light which caused her to bound out of bed into the middle of the room, where she found herself quite close to a man, who at once ran out of her door and down the stairs to the kitchen. The screams of the two maids, Alice and Mary, brought Ohashi, the butler, from his room across the hall, and together the three went downstairs. There they discovered that the silver chest had been rifled, and that Mrs. Compton's room was in such disorder as to indicate that a burglary had been committed. The maid Alice then called the defendant on a telephone connected with the stable, and from thence with the coachman's house by means of an electric bell, which the defendant had been instructed to answer directly in person whenever it rang

at night or at an unusual hour. Contrary to these instructions the defendant, instead of answering the bell directly, first answered the telephone, which could only be done from the stable, and then made his appearance at the Compton house. As he came in each of the other servants, Ohashi, Alice and Mary, noticed that his face was blackened over the eyebrows, under the eyes, on each side of the nose and across the lips. He explained to Alice that he had been putting coal on the fire and must have daubed some of the soot on his face. His next remark was, "we must go up and see if Miss Polly (the child) is safe; that is what we are here for." Together the four servants, Ohashi, Mary, Alice and the defendant, went upstairs. The defendant went directly to the bed where the body of the deceased lay and shouted: "This girl is dead, Alice, this girl is dead." Meanwhile Alice had looked into Polly's cot and at first thought she was gone, but the defendant raised the bedclothing and disclosed her sleeping safe and sound. Efforts were made to resuscitate the deceased with ammonia and whisky, and when these failed Alice directed the defendant to telephone for Dr. McKenzie. He called Dr. Knott, a veterinary, and when Alice remonstrated with him he told her to go to hell. The prosecution refers to this circumstance as indicating that the defendant was so confused that he did not know the difference between Dr. Knott, the veterinary, and Dr. McKenzie, the physician, but this point is greatly weakened, if not destroyed, by the testimony of the maid Mary, who said she suggested telephoning Dr. Knott as well as Dr. McKenzie, for they wanted Mrs. Knott more than her husband. Having finished telephoning, the defendant said something about going back to his house as he was not dressed and wanted to wash the black from his face. Alice begged him to remain and told him to wash in Mrs. Compton's room. Meanwhlie Alice procured a pair of trousers, which she offered to the defendant, but he declined them with the remark that he had trousers on. At twenty minutes past

four o'clock in the morning Dr. McKenzie arrived. He at once made such observations as would naturally suggest themselves to the experienced physician. He found the body of the deceased in the bed slightly turned to the right side. The face was dark, discolored, distorted and swollen; the eyes somewhat protruding and partially open, and the tongue swollen. There were bruises on the neck which might have been made by the grip of a human hand. Dr. McKenzie noticed dark, black dirt on her breast and some on her underwear. There were marks on both wrists as if a cord had been wound twice around the wrists, and subsequently the strings, belonging to the pajamas worn by the deceased, were found beneath the bed; and there was testimony to the effect that the marks on the wrists might have been produced by these strings. Later in the day an autopsy was performed by Doctors Jacobus and McKenzie under the direction of Dr. Andrews, one of the coroners of Dutchess county. These three doctors were all agreed that the death of the deceased was due to asphyxiation from strangulation. The earlier observations made by Dr. McKenzie were supplemented by others indicating that the deceased had been the victim of a carnal assault. Black sooty spots, of the same character as those noticed on the breast of deceased, were found at the crotch of the underclothing worn by her. There were abrasions and black dirt on the vulva. In the vagina there was a fluid which was withdrawn with a syringe and subjected to a miscroscopical examination. It was found to be human semen. There were also injuries to the lower limbs. Without going further into these nauseating physical details, it suffices to say that the facts disclosed by the autopsy and the trial warranted the conclusion that the deceased came to her death by strangulation at the hands of a man who was at the time engaged in the commission of a criminal assault upon her person. The next step in the logical development of this gruesome story will be to ascertain in what manner the defendant is connected with this foul deed.

The defendant was a young man twenty-two years of age. His wife had for some time been absent from home. On the evening preceding the homicide he had been out driving with the maids, Alice and Mary, and had been drinking at least enough to thoroughly fire his blood. There was evidence to the effect that in November he stated to a man engaged in clipping a pony for Mr. Compton that the deceased was a nice girl, and he would have sexual intercourse with her if he had to do it when the Comptons were in New York; that, about a week before the tragedy he had made a remark to a man employed on the place, indicating that he had lascivious designs on the person of the deceased; that a day or two later he made a similar statement to another in language too vulgar to print; and on the day of the homicide he confided his lust to still another employee. Upon the body and clothing of the deceased were found black spots apparently of the same color and substance as the marks upon his face. When he returned from the drive with Alice and Mary he asked the former what she was going to give him for the ride. When he, with Ohashi, Alice and Mary, went upon the sleeping porch, he at once exclaimed: "This girl is dead, Alice, this girl is dead," although he had done no more than to place his hand upon her person. After the arrival of Dr. McKenzie Alice and the defendant again went up to the place where the deceased lay, and the defendant then said the husband of the deceased must have done the deed. He was the only one of the Compton servants who manifested any interest or anxiety as to the movements of the officers. This is indicated by his going out to meet them on the road, and suggesting that they could not get through with their automobile, and again in his inquiries of other servants or employees designed to elicit information as to the suspicions expressed by the officers. He was the person who suggested that Ohashi had gone westerly, in the direction of the ice house, at an hour when Ohashi must have been in the Compton house; and the ice

house is the place where the Compton revolver was found by
Duncan on the morning of January 13th. These were the cir-
cumstances which the jury might have found to have been es-
tablished by the testimony, and we think that, standing alone,
they would have justified the conclusion beyond a reasonable
doubt that the rape and the murder were the work of the de-
fendant.

But we must go farther. The case was submitted to the jury
upon the theory that the homicide was committed by the de-
fendant while engaged in the commission of the two distinct
felonies of rape and burglary, and it is important to determine
whether the evidence connects him with both. As regards the
burglary, the evidence leads us through a sequence of circum-
stances quite as incriminating against the defendant and no less
convincing to the impartial mind. There is in this branch of
the case, moreover, a disclosure of facts which tend to unite the
two distinct felonies of rape and burglary as parts of one gen-
eral criminal scheme, and to identify the defendant as its au-
thor and perpetrator.

Early on the morning of the homicide the chief of police of
the city of Poughkeepsie, with an under sheriff and several as-
sistants, went to the Compton residence. They made the jour-
ney in an automobile which became stalled in the deep snow
about a quarter of a mile from the Compton residence. They
were met by the defendant who told them that they could not
get through. Despite this information, the officers proceeded
on their way, accompanied by the defendant. After arriving at
the house the servants were interviewed, the defendant with
the others, and thus the day wore on into the afternoon. Dur-
ing the afternoon the defendant asked Maroney, one of the
Compton employees, who it was whom the officers suspected,
and Maroney replied that he did not know. Soon after this
McCabe, the chief of police, went over to the defendant's house
in the pursuit of his investigations. Entering the house and
exploring two or three rooms he called, "Frank," and received

no answer.  Just then McCabe heard a sound, as of something
dripping on the floor, and he went into a bedroom, drew a cur-
tain and saw a bloody razor on the bed and a pool of blood on
the floor.  He looked under the bed and there he saw the de-
fendant with his throat cut.  McCabe directed him to come out
and as he did so he said, "I didn't do it, chief, I don't want to
go to jail, but I didn't kill Sarah."  A doctor was sent for and
the defendant was taken to the Vassar Hospital where he recov-
ered.  After the defendant had been sent to the hospital, Mc-
Cabe searched the defendant's house.  Lying upon a bureau
there was a note in the handwriting of the defendant and evi-
dently intended for his wife.  It read, "Oh, sweetheart, I am
not guilty of this crime, believe me.  Your loving husband but
no more.  Frank."  In the cellar, in the bottom of a barrel par-
tially filled with potatoes, he found a silk dress, a silk corset
and some stockings.  These were later identified as belonging
to Mrs. Compton.  Meanwhile the silverware and some other
articles which had been stolen from the Compton house were
still missing.  On Sunday, January 16th, there was a further
search of the coachman's house by Chief of Police McCabe and
Under Sheriff Hornbeck, assisted by a number of others.  On
the second floor it was seen that a metal collar, which had cov-
ered the stovepipe hole in the chimney, had been removed and
had been partially replaced.  A man named Burch thrust his
arm into this hole and down the flue but felt nothing.  He then
took a stick and reached farther down the flue, this time pro-
ducing sounds which indicated that the silverware was in the
chimney.  Another man went to a lower opening in the chim-
ney and there was the Compton family silver to the number of
more than a hundred pieces.  This silver bore marks of having
been subjected to great heat, and the soot by which it was more
or less discolored tended to explain the place and the manner
in which the defendant had covered his face and hands with a
black substance.  A further search revealed, in the parlor stove

of the coachman's house, the charred or partially consumed remains of various articles of wearing apparel which had belonged to Mrs. Compton. In these circumstances there is evidence which points very directly to the defendant as the perpetrator of the burglary.

The purpose of the burglary and theft is not so obvious. Neither can the exact sequence of the events of that night be demonstrated. It is evident, of course, that if the defendant committed either the rape or the burglary it must have been done before the servants, Ohashi, Alice and Mary, were aroused from their sleep; and it is practically certain that the man who committed either of these crimes was also guilty of the others. It is quite within the bounds of reasonable probability that the defendant, intent upon the crime of rape, first committed the burglary and afterwards the murder for the purpose of diverting suspicion from himself. This theory, and every other that may be suggested by the circumstances, excludes the possibility of so segregating the burglary from the other events of this tragedy as to render it a distinct and separate crime which had no relation to the homicide. The burglary was no less a part of the offense than the rape, and it was not error to charge that if the homicide was perpetrated by the defendant while engaged in the commission of either of these felonies, it was murder in the first degree. The language of the statute defining murder in the first degree includes in that category a homicide committed without a design to effect death by a person engaged in the commission of, or in an attempt to commit, a felony, and it would be absurd to hold that it applies to a person engaged in the commission of a single felony, but not to one who is engaged in the commission of two or more felonies.

We now turn to the confessions of the defendant. That they were made is not disputed, but it is said that they were extorted from him under circumstances which render them inadmissible as evidence. The defendant made his first statement

at the hospital on January 14th, the day succeeding the homi-cide. There is no pretense that it was not made voluntarily. Neither is it now claimed that it was true, and it is in fact at variance with his later statements. It is to the effect that he had been out with Alice and Mary and had been drinking quite freely; that after they returned and he had taken care of his horse he went to his house and retired; that at about one o'clock in the morning he heard Polly cry; that he lay down again until she cried a second time, when he arose and walked carefully to the west side of the Compton house; that as he stood there he heard a conversation between Ohashi, the butler, and Sarah, the deceased; that Ohashi said, "You know, Sarah," and then he heard Sarah gurgle, and a little later he heard Polly again; that he also saw Ohashi flash a light across Mary's bed and saw him with a light coat on; that in a few minutes Ohashi came out of the south end of the house with a bundle un-der his arm and walked down to Samuel Thorne's place; that he, the defendant, then went back to his own house, where he re-mained in bed until he was called by telephone at about 3 o'clock in the morning; that he answered the call and went quickly to the Compton house, where he was met by Ohashi, Alice and Mary, who told him there were burglars in the house; that they searched the house and could not find anybody, and so he, the defendant, suggested that they go upstairs to see about Sarah; that they went up and found her dead; that he then went to the sink and washed his face, which had become black-ened, as he thought, when he was putting coal in the stove. This statement was signed by the defendant in the presence of wit-nesses, and apparently without any solicitation or coercion. It cannot be seriously contended that the officers were over-zealous in trying to get a further statement from the defendant. The one just referred to was so manifestly incredible that the officers would have laid themselves open to the charge of stupidity or inefficiency if they had halted there. The story that the

defendant had heard the deceased gurgle and had seen the butler emerging from the house with a bundle in the stillness of the night, without so much as a suggestion that the defendant had concerned himself about this unusual proceeding, is too fantastic for belief, and his failure to mention the matter when Sarah was found dead plainly stamps the tale as a clumsy fabrication. The defendant's second statement was made to Under Sheriff Hornbeck at the hospital on the next day, January 15th, and is substantially the same as the first one made to McCabe, although it goes into greater detail in suggestive insinuations that Ohashi was the murderer.

The defendant's third statement was made at the hospital on Sunday, January 16th, after McCabe, the chief of police, had been at the Compton house, and the hidden silverware had been discovered. If anything beyond its inherent improbability had been needed to refute defendant's first story, the discovery of these chattels clearly demanded further investigation. With that in view McCabe went to the defendant, told him of having found the silver, and taxed him with having been untruthful. Thereupon, according to McCabe, the defendant said, "Now I will tell you the truth." The statement which he then made and signed is, in substance, as follows: That on the night of the sleigh ride after the defendant returned, Ohashi came up to the stable and said, "Frank, you help me and I will help you. I want you to come down at midnight to the house;" that Ohashi then gave the defendant a drink of whisky; that at midnight the defendant went to the Compton house and Ohashi brought him out a bundle of dresses and silverware; that the defendant took the articles to his house where he burned them in the parlor stove and then he tried to burn the silverware but without success and so he dropped it into the chimney flue where it was found; that Ohashi wanted to give him some money, which he refused to take. At this point in the progress of the defendant's third statement, the chief of police said to

him, " Now, I don't think you are telling the truth yet," and the defendant replied, " I won't tell you any more, chief, but when my mother comes here, and I see my mother, you come back here and I will tell you the whole truth." Here again is a statement in which the defendant refers to some clearly established facts, such as the burning of the dresses, the attempts to burn the silver, and the place in which it was hidden, but his story as to the manner in which they came into his possession was such a transparent invention as to emphasize his practical admission that he had not yet told the whole truth.

In the defendant's fourth and final statement he at last admitted the commission of the murder, although disclaiming any intention to kill the deceased, and this is the only statement which is said to have been improperly obtained from him. We have referred at some length to the defendant's prior statements, partly to disclose the contradictions which they contained, but more for the purpose of showing how natural and proper it was for the officers to work for still further statements under such conditions. This last confession, which is printed in full in the record, is to the effect that the defendant killed the deceased but that he did it only for a scare and not for murder; that he had been drinking while out driving with the maids, and had another big drink of whisky from Ohashi when he returned; that he had a very faint recollection of getting home; that when he had taken care of the horse, he changed his clothes and went over to the kitchen in the Compton house; that he went upstairs and into the nursery or open-air sleeping porch; that he remembered something about Sarah but he was just crazy drunk and did not know what he was doing; that he faintly remembered being on the porch where Sarah and Polly were asleep, and that he intended to scare Sarah; that he did the deed; that no one else had anything to do with this crime, and that nothing was locked when he entered the house.

As bearing upon the manner in which this last confession

was obtained, the defendant's mother and sister testified that the former had been sent for by Under Sheriff Hornbeck, who told her that the only thing that would save the defendant from the electric chair would be for him to make a confession; that under the influence of the fear and the hope of leniency pro-duced by this statement, she pleaded with her son to confess that he had committed the murder; that for some time he was obdurate and continued to repeat his denials, but he finally yielded to her tearful entreaties and thus made the confession. Hornbeck was very positive and explicit in his denial that he had made any such statement to the defendant's mother and insisted that the confession was voluntary. The issue of fact raised by this conflict of testimony was fairly and fully submit-ted to the jury, and the verdict necessarily implies that the jury accepted the testimony of Hornbeck as true. Our first reading of the record left upon our minds the impression that the police officers had united in a systematic and persistent at-tempt to wring a confession from the defendant. The number and variety of defendant's confessions, supplemented by the able argument of his counsel, were well calculated to raise the sus-picion that the defendant had been subjected to what, in crim-inal parlance, is known as the third degree; but the facts as dis-closed by the record, when carefully studied, absolve the police officers from any such imputation.

A short and compact *resume* of the facts and circumstances will be helpful in determining the question whether the evi-dence was sufficient to warrant the verdict of the jury. The de-fendant had expressed lecherous designs upon the person of the deceased. He had been drinking on the night of January 12th, and his wife had been absent from home some weeks. The de-ceased was found strangled to death under circumstances which leave no doubt that she was killed by the man who raped her. Her body and her blothing bore marks which can be explained only upon the theory that a part of the soot upon the defend-

ant's face and hands had been transferred to her body by personal contact. A burglary had been committed in the Compton house and the property stolen was found hidden in the defendant's house, charred, partially consumed by fire, and covered with soot. The defendant made statements which, at first, were intended to throw suspicion upon Ohashi, but finally admitted the commission of the murder by the defendant. The question whether these statements were voluntarily made was fairly submitted to the jury and the verdict implies that these confessions were regarded as freely made. Upon this record there is no escape from the conclusion that the cause of death of Sarah Brymer was conclusively established as an independent fact, and that the defendant's guilt of the homicide, committed while engaged in the two felonies of rape and burglary, was proven beyond a reasonable doubt.

The confessions were properly admitted in evidence (People v. Rogers, 192 N. Y. 331; People v. Brasch, 193 N. Y. 46), and the indictment in the common-law form was sufficient to sustain a conviction of murder in the first degree, even though there was no evidence of premeditation and deliberation, for the proof clearly brought the case within the statutory definition that a homicide committed by a person while engaged in the commission of a felony constitutes the crime of murder in the first degree. People v. Giblin, 115 N. Y. 196; People v. Meyer, 162 N. Y. 357, 370, 14 N. Y. Crim, 487; People v. Sullivan, 173 N. Y. 122, 180. The exceptions taken by defendant's counsel to the remarks made by the district attorney in the course of his summary were not well taken. The district attorney made it perfectly plain that the defendant was not to be prejudiced by his failure to testify, and he was clearly within his rights in arguing to the jury that the defendant's unexplained possession of the stolen property was evidence which should be considered upon the question whether the de-

·fendant committed the burglary, and in the commission thereof perpetrated the murder.

We have carefully examined this record with a constant appreciation of the responsibility which comes with the power to order a new trial in any capital case when justice requires it, even when no exceptions have been taken, but we can find nothing which would justify a reversal and the judgment of conviction must, therefore, be affirmed.

·CULLEN, Ch. J., GRAY, VANN, WILLARD BARTLETT, HISCOCK and CHASE, JJ., concur.

Judgment of conviction affirmed.