THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* JOHN VALLETUTTI, Appellant.

Argued November 20, 1947; decided March 11, 1948.

*Harry G. Anderson, Edward H. Levine* and *Victor L. Anfuso* for appellant. I. The only reasonable conclusion from all the testimony is that defendant's alleged confession was obtained by unlawful methods. The trial court should therefore have excluded the confession. (*People* v. *Doran*, 246 N. Y. 409; *People* v. *Barbato*, 254 N. Y. 170; *People* v. *Weiner*, 248 N. Y. 118; *People* v. *Rogers*, 13 Abb. Prac. [N. S.] 370; *People* v. *Mummiani*, 258 N. Y. 394; *People* v. *Alex*, 260 N. Y. 425.) II. The trial court in its charge committed reversible error in limiting the effect of the proof with respect to the prolonged detention of the defendant prior to the taking of the alleged confession. (*People* v. *Alex*, 265 N. Y. 192; *People* v. *Elmore*, 277 N. Y. 397.) III. It was reversible error for the trial court to state in the presence of the jury that it would admit the defendant's confession in evidence before any testimony had been received refuting the defendant's testimony that the confession had been obtained by force and violence.

*Miles F. McDonald, District Attorney* (*Solomon A. Klein* of counsel), for respondent. I. The confession was not involuntary as a matter of law. A substantial question of fact was presented which was properly submitted for the jury's determination. (*People* v. *Doran*, 246 N. Y. 409; *People* v. *Weiner*, 248 N. Y. 118; *People* v. *Barbato*, 254 N. Y. 170; *People* v. *Mummiani*, 258 N. Y. 394; *People* v. *Malinski*, 292 N. Y. 360, 324 U. S. 401; *Lisenba* v. *State of California*, 314 U. S. 219; *People* v. *Mummiani*, 258 N. Y. 394; *People* v. *Alex*, 265 N. Y. 192; *People* v. *Trybus*, 219, N. Y. 18; *People* v. *Randazzio*, 194 N. Y. 147.) II. The trial court's charge with respect to the effect of unnecessary and illegal delay in arraignment was not erroneous. (*People* v. *Doran*, 246 N. Y. 409; *People* v. *Mummiani*, 258 N. Y. 394; *People* v. *Alex*, 265 N. Y. 192.)

DESMOND, J. Early on the morning of October 11, 1945, two men attempted to hold up a Brooklyn tavern. One of the patrons resisted, and was shot and killed.

On December 7, 1946, this defendant, then nineteen years old, was released from confinement at Coxsackie reformatory for another offense, and was taken into custody at the reformatory by two New York City patrolmen. Handcuffed, he was driven to Brooklyn in the officers' automobile. Questioned during the ride as to his alleged complicity in the barroom killing, he denied guilt or knowledge. In January, 1946, and again in March of that year, while in the reformatory, he had been interviewed at length by an assistant district attorney of Kings County as to this same holdup and homicide, but had asserted his complete innocence.

Defendant and the policeman arrived at a Brooklyn police station on the afternoon of December 7th, and later in the evening defendant was taken to a different police station. At about four o'clock on the morning of December 8th, after he had been questioned, off and on, for eight hours or more by various policemen, and after he had been in police custody for about thirty hours, defendant told the officers that he had been one of the two holdup men. An assistant county prosecutor and a stenographer were then sent for, and a formal confession taken down. That confession was the only evidence of guilt offered against defendant at the trial. On it defendant was found by the jury to be guilty of felony murder, and by the court sentenced to die, although the jury had in its verdict recommended life imprisonment. None of the several people who were in the bar at the time of the killing were called to testify, except the proprietor who could not describe the holdup man. No one identified defendant as one of the culprits, and no one saw him at or near the place that night. It is patent that, unless the confession was shown to have been, beyond reasonable doubt, a voluntary and reliable one, the conviction must fall.

It is undisputed that during the long hours of questioning by the police, defendant asked for, and was refused, permission to notify his parents or to use the telephone. Defendant on the trial swore that he was brutually and continuously assaulted by the policemen until he could resist no more, and then made the admission of guilt. That admission, swore defendant, was

wholly untrue and forced from him by kicks and punches. The officers denied that they had mistreated defendant, the assistant district attorney showed that defendant did not complain to him of any beatings, and it appeared that no such complaint was voiced by defendant at the preliminary hearing before the magistrate, or on his admission to the city prison. However, it plainly appears that defendant did somehow sustain substantial physical injuries while in close custody of public officials. A jail record establishes that on December 10, 1946, defendant was examined by a jail physician whose written report says that he found " contusions of left anterior lower chest wall and numerous small bruises of scalp." Those wounds were such as could have been caused by blows. No effort was made by the prosecution to show (aside from the denials by the policeman of any violence) how or where these injuries were in fact inflicted, nor did the prosecution call as a witness the physician who made the entry in the jail records. This court said in *People* v. *Barbato* (254 N. Y. 170, 176): " The District Attorney on this evidence was called on to account for the defendant's condition." A similar duty was on the People in this case, and no sufficient accounting is in the present record.

Despite section 165 of the Code of Criminal Procedure, defendant was not arraigned in court until the morning of December 9th, forty-eight hours after the police officers had taken him from Coxsackie.

It is not claimed that defendant was the robber who actually fired the shots. The killer was William Cronholm who, after a separate trial, had been convicted of the crime in June, 1946. Cronholm appeared as a defense witness on the trial of this defendant and swore that defendant had nothing to do with this crime. Cronholm, arrested several months after the killing, had confessed to the police that he was the killer. Then, pressed by the police to name his associate, he had named this defendant. On the trial Cronholm insisted that he had so inculpated this defendant because he (Cronholm) did not know the full name of the man who was with him in the holdup, and because he was afraid to tell that to the police, lest they, disbelieving him, should continue to beat him. Cronholm told this jury that he had expected defendant would be able to establish an alibi, since, he said, defendant was not implicated in the holdup at all.

Although defendant, when first suspected of this crime, had denied even seeing Cronholm that night, he testified on the trial that he had met Cronholm and a woman friend of the latter at another barroom some hours before the holdup. Defendant, as well as Cronholm and the latter's woman friend, said that Cronholm and the woman left that other tavern hours before this crime, and that defendant did not leave with them. A bartender and another woman testified that defendant stayed in that other barroom until closing time (four o'clock in the morning) and then walked home with the woman witness.

Admissions, freely and voluntarily made by a person charged with a crime, are not only acceptable, but convincing evidence of his guilt. But an involuntary " confession ", is, by its very nature, evidence of nothing. Common sense and simple justice have put into our Code of Criminal Procedure, section 395, which forbids the reception of a confession " made under the influence of fear produced by threats ". Application of that statute is frequently difficult. Many a criminal record which comes to us contains a confession, and conflicting testimony as to whether or not the confession was extorted from the defendant. If there is a fair question of fact as to this, the jury's verdict is not interfered with. But a confession is not proof at all unless it be a free act. This court must see to it that a reasonable doubt on this score is resolved in favor of a defendant, and, in capital cases, we are commanded also to deal with the weight of evidence (*People* v. *Crum,* 272 N. Y. 348, 350). In most cases where police brutality in obtaining a confession is charged and denied, there are no separate criteria for settling the dispute. Then, though sometimes with reluctance and suspicion, we are bound to affirm (see POUND, J., in *People* v. *Barbato, supra,* 254 N. Y. at p. 173). But in the case before us we have, unexplained by the People, wounds obviously suffered while in custody and reasonably ascribable to the alleged assaults. Add that undisputed fact to these other undisputed facts: that defendant stoutly avowed his innocence when under the protection of reformatory officials, that he was held incommunicado by the police for twenty hours before he said he was guilty, that his arraignment was illegally delayed, that he was nineteen years old, that he was forbidden to communicate

with parents, friends or counsel, that there is, outside this confession, no scintilla of proof of his guilt, and that the killer took the stand to say that this man was not his confederate. On the whole case, we must come to the same conclusion as did this court in *People* v. *Barbato* (*supra,* 254 N. Y. at p. 177): " * * * on the weight of evidence the physical facts corroborate defendant's statement that injuries were inflicted by the police officers to procure a confession."

Explaining the rule of justice and decency which excludes involuntary confessions, this court said in an early case: " The principle upon which this rule is based is obvious. It is, that we cannot safely judge of the relation between the motives and the declarations of the accused, when to the natural agitation consequent upon being charged with crime is superadded the disturbance produced by hopes or fears artificially excited. It is because it is in its nature unreliable, and not on account of any impropriety in the manner of obtaining it, that the evidence is excluded " (*People* v. *McMahon,* 15 N. Y. 384, 386). The rule was clearly stated in England as long ago as 1783, in *Warickshall's* case (1 Leach [4th ed.] 263, 264), as follows: " It is a mistaken notion, that the evidence of confessions and facts which have been obtained from prisoners by promises or threats, is to be rejected from a regard to public faith; no such rule ever prevailed. * * * Confessions are received in evidence, or rejected as inadmissible, under a consideration whether they are or are not entitled to credit. A free and voluntary confession is deserving of the highest credit, because it is presumed to flow from the strongest sense of guilt, and therefore it is admitted as proof of the crime to which it refers; but a confession forced from the mind by the flattery of hope, or by the torture of fear, comes in so questionable a shape when it is to be considered as the evidence of guilt, that no credit ought to be given to it; and therefore it is rejected."

If we examine this record in the spirit of the settled rule, if we give any real effect to section 395 of the Code of Criminal Procedure, we cannot allow the use of this confession, on this record. Obviously, we cannot first use it in weighing this man's guilt, then move on to an examination of its trustworthiness and admissibility (see *Bram* v. *United States,* 168 U. S. 532, 541).

" Whether true or false, confessions obtained in violation of section 395 of the Code of Criminal Procedure are not sufficient to sustain a conviction " (*People* v. *Barbato, supra,* 254 N. Y. at p. 174).

Our decision that the reliability of the confession, and consequently, the guilt of defendant, were not proven beyond a reasonable doubt, makes unnecessary any inquiry into the alleged violation of defendant's rights under the Federal Constitution (see *Malinski* v. *State of New York,* 324 U. S. 401, and *Haley* v. *State of Ohio,* 332 U. S. 596).

The conclusions stated herein may seem logically to lead to a dismissal of the indictment as well as a reversal of the judgment. However, it is the usual practice of this court to order a new trial in such situations. The judgment of conviction should be reversed and a new trial ordered.

Lewis, J. (dissenting). In this capital case the decision reached by a majority of the court rests chiefly upon their conclusion that a proper application of section 395 of the Code of Criminal Procedure to the record at hand dictates, as a matter of law, the rejection of the defendant's confession as evidence of his guilt. I cannot reconcile that conclusion with the principle — firmly established and often applied by this court — that " if there is no conflict in the evidence with reference to threats, the question of the admission of confessions is for the court, but if there is a conflict the question ultimately is for the jury." (*People* v. *Randazzio,* 194 N. Y. 147, 156.) Another statement of the rule — which has peculiar application to the record before us — was made by Judge Pound writing for the court in *People* v. *Barbato* (254 N. Y. 170, 173) : " When the evidence of the People meets the evidence of the defendant as oath against oath, with no corroboration on either side, a fair question of credibility is presented for the jury to decide." (See, also, *People* v. *Doran,* 246 N. Y. 409, 416–417; *People* v. *Weiner,* 248 N. Y. 118, 122; *People* v. *Nunziato,* 233 N. Y. 394; *People* v. *Schermerhorn,* 203 N. Y. 57, 71.)

Within the rule stated above our problem comes to this — Is this a case where there is no conflict in the evidence as to the circumstances which the defendant claims made his confes-

sion involuntary? Or does the People's evidence — descriptive of conditions under which that confession was given — "meet the evidence of the defendant as oath against oath" to produce a factual conflict and thus present a question of credibility which can be resolved only by the triers of the facts?

In an effort to support the defendant's repudiation of his confession — which was then the subject of inquiry as to whether it was made under the influence of fear produced by threats — it was contended in his behalf that he had been subjected to brutal beatings which induced him involuntarily to admit his guilt. To that end the defendant testified that after his arrival at the police precinct station in Brooklyn at about two-thirty in the afternoon of Saturday, December 7, 1946, he was taken to a small room where for a period of about three quarters of an hour he was questioned by Detective Kabelka and a police lieutenant. During all that time he denied his guilt. Then followed a period of questioning when, according to his testimony, Detective Kabelka "got violent" and, in the presence of a police lieutenant, struck the defendant in the stomach and the face, grabbed him by the hair, threw him off his chair and hit him on the neck with his clenched fist. It was the defendant's testimony that he was beaten about one hundred times by Detective Kabelka and the police lieutenant, and was thrown against the wall with such force as to cause him to fall to the floor in a semiconscious condition; that when he attempted to rise he was kicked and rendered completely unconscious. Upon regaining consciousness, he was again slapped in the face and the threat was made that such treatment would continue all night. As a result of these alleged acts of violence the defendant testified that there was a "welt" on the side of his face, his "head was all bleeding  *  *  *  from where they pulled the hair out" and that "there was bunches [of hair] on the floor." Finally, according to the defendant, at three-thirty on Sunday morning (December 8th) — the date being important — he told Detective Kabelka he could stand no more and that he would sign anything the detective wanted.

With the picture in mind which the defendant gave as descriptive of his blood-soaked scalp, his welted face and his general dishevelment — all of which he claims resulted from violent

treatment administered to him to induce his admission of guilt —
we turn to the testimony of the assistant district attorney who
arrived at that hour, about four o'clock on Sunday morning
(December 8th), to take whatever confession the defendant was
to make. Incidentally it may well be noted that the honesty
of the assistant district attorney who took the confession was
the subject of an encomium placed upon the record by counsel
for the defendant and concurred in by the Trial Judge, and his
conduct during his taking of the confession was commended
by the defendant himself.

The assistant district attorney testified that at that early
Sunday morning hour — which was within an hour after the
long period of violent assaults to which the defendant claims
he was subjected — the defendant's appearance was " normal ",
he bore no marks, redness, swellings or bruises on his face,
neck, head or hands and there were no signs of blood upon him.
Indeed, the assistant district attorney stated under oath that
his appearance then was " no different " than his appearance
at the trial. The defendant made no complaints at that time
and when asked by the assistant district attorney whether he
had been " treated fairly by the police? " — he answered " Yes,
sir " — when asked " Do you have any complaints to make? " —
he answered " No, sir ".

In addition to the testimony by the assistant district attorney
— which, it is important to note is in direct conflict with the
defendant's description of his battered condition at that hour —
the People called as witnesses every person who had been
accused by the defendant of threatening him or of making
violent assaults upon him. In each instance the witness denied
the accusation categorically.

I find it difficult to conceive of a more direct evidentiary
conflict than is disclosed by this record between the testimony
of the defendant bearing upon alleged maltreatment designed
to induce his admission of guilt, and the testimony of the
People's witnesses on the subject of that same confession.

True it is that on December 10th, more than a day and one
half *after* his confession and more than a day after he was
arraigned and had been removed from the custody of the police to
Raymond Street jail where he was in the custody of the Depart-

ment of Correction (see New York City Charter, ch. 25, § 623, subd. 2; Administrative Code of City of New York, ch. 25), he then complained of headache and a pain in his side for which the jail physician prescribed aspirin. The jail record contains the notation that at that time he had contusions on the left anterior chest wall and numerous small bruises of the scalp. But it is to be noted that the bruises and contusions last mentioned above were first brought to the attention of those in charge at Raymond Street jail a substantial length of time *after* he had confessed and had been withdrawn from police custody for lodgment in that jail. In that connection there is evidence that he had made no complaint as to his physical condition on Monday morning, December 9th, when he was arraigned before a magistrate. There is also evidence that the court record made at the time of his arraignment — which record accompanied the defendant to the Raymond Street jail — bore the notation " condition good ". When the time came — immediately after his arraignment — for him to be transferred from police custody to the custody of the Department of Correction functioning at Raymond Street jail, he was asked by the admittance clerk, in accord with regulations, whether he had " any cuts or bruises or any diseases " or did he wish to see a doctor for any reason. To that inquiry he responded that he had " no complaints."

The majority opinion suggests that upon the trial it was incumbent upon the District Attorney to account for contusions and bruises which the defendant claims were inflicted by the police but which concededly he did not disclose until he had been lodged in Raymond Street jail for a period of more than a day after his confession was taken. That obligation was fulfilled by the District Attorney when, after the defendant had testified, the People called to the witness stand not only every police officer whom the defendant had accused as his assailant — each of whom categorically denied the accusation — but also the assistant district attorney to whom the defendant had expressly exonerated the police of unfair treatment and who testified that at the time he took the defendant's confession the defendant looked " no different " than he did as he sat in the court at the time of his trial.

There is a significant difference between the facts in the present case and those which led to the decision in *People* v.

*Weiner* (*supra*), where the evidence established that the defendant had a mark on his cheek and that his shirt and tie bore blood spots *immediately after the police had questioned him.* The present case also differs on its facts from *People* v. *Barbato* (*supra*) in which the proof showed that defendant had a blackened eye when arraigned and — as disclosed by a doctor's examination on the day following — swellings and black and blue spots on his body, back as well as front. In the case at bar, as already stated, the first information that the defendant had bruises, which were only on his chest and head — parts of the body defendant himself could easily have reached — came after his confession and arraignment and after he had been in jail for almost two days. If — as is not at all unlikely — the injuries were self-inflicted, the prosecution had only one method whereby it could dispute defendant's claim that he had been beaten by the police, and that was the method which it pursued by calling to the witness stand every official and every other person who had seen or spoken to defendant during the time that he was being questioned and until the moment of his arraignment and confinement in jail, each of whom denied either that he had threatened or beaten defendant or had seen or heard any evidence of threat or violence. I am at a loss to perceive what more the State could have done in this case where the injuries might well have been inflicted by the defendant himself.

Subscribing, as I do, in full measure to the majority's jealous insistence upon fair play by police officers in obtaining confessions, I still believe that, when the State — put to its proof to justify a confession as voluntary — has discharged that burden in the only way it could, by the sworn testimony of every person connected with the matter, and when the jury has accepted and credited that testimony, it goes too far, in the circumstances here presented, to say that the testimony should be cast out as unbelievable.

The conclusion I have reached was also influenced by the fact that the defendant's confession was largely narrative in form — not a succession of " yes " and " no " answers to questions propounded by inquisitors. The lurid statement of facts to be found in his narration of the crime convinces me — and apparently convinced the jury — that only a man who had lived

through that experience could have volunteered the details with such accuracy.

In the light of rulings by this court cited (*supra*) the record of evidence, as I view it, afforded a sound legal basis not only for submission to the jury of the question whether, within the provisions of section 395 of the Code of Criminal Procedure, the defendant's confession was voluntary but also whether, within section 165 *id.*, the time which elapsed — less than two days, including a Sunday — between Saturday afternoon (December 7th), when the defendant reached Kings County in the custody of the police, and Monday morning (December 9th) when he was arraigned, amounted to " unnecessary delay " in taking the defendant before a magistrate. Upon each of those subjects I regard the following excerpt from the court's charge to be a correct and adequate statement of the applicable law —

" It is for you gentlemen to determine from the facts in this case whether or not the arraignment of the defendant was unnecessarily and illegally delayed. In determining that question, you must take into consideration all that transpired between the time the defendant was taken into custody and his arraignment on December 9, 1946.

" If, on the basis of all the facts, you believe there was unnecessary and illegal delay, please understand, gentlemen, that you are only to consider this in connection with the question as to whether or not the admissions made by the defendant were to any extent induced by any such illegal delay. If you decide that such confession or admission was made as the result of fear induced by threats, duress, or violence, or induced by unnecessary and illegal delay in arraignment, the confession or admission so obtained cannot be used against the defendant, and is to be disregarded even if you believe it to be true. No confession is admissible unless it is voluntary. Its primary meaning imports a condition of mind that is free and unconstrained by fear, or inspired by false hope, or threats or violence, or by illegal and unnecessary delay in arraignment, but at any rate, it is a question of fact for you, the jury, to determine. You also must determine and decide, if you do accept such confession and decide that it was made voluntarily, whether or not the confession is true. Of course, if you decide that the

confession was not voluntary or is not true, you must acquit the defendant."

Accordingly, I dissent and vote to affirm the judgment of conviction.

LOUGHRAN, Ch. J., THACHER and DYE, JJ., concur with DESMOND, J.; LEWIS, J., dissents in opinion in which CONWAY and FULD, JJ., concur.

Judgment of conviction reversed, etc.