UNITED STATES of America ex rel.
Vincent CERULLO, Petitioner,

v.

Harold W. FOLLETTE, Warden of Green
Haven Prison, Respondent.

66 Civ. 4107.

United States District Court
S. D. New York.

Dec. 30, 1968.

J. Kenneth O'Connor, New York City,
for petitioner.

Louis J. Lefkowitz, Atty. Gen. of the
State of New York, and William Cahn,
Dist. Atty. of Nassau County, by Jules
E. Orenstein, Asst. Dist. Atty., Nassau
County, for respondent.

## OPINION

TYLER, District Judge.

For the previous history of this protracted litigation, see, most recently, United States ex rel. Cerullo v. Follette, 393 F.2d 879 (2d Cir. 1968); People v. Cerullo, 18 N.Y.2d 839, 275 N.Y.S.2d 845, 222 N.E.2d 605 (1966) and cases therein cited.

After the mandate came down following the above-mentioned decision of the Court of Appeals for this circuit dated May 8, 1968, a further hearing as directed therein was held before me on September 25, 26, 27, October 4 and October 14, 1968. Briefs and proposed findings were submitted to the undersigned by November 27, 1968. Essentially, the ultimate issue to be decided here is whether or not Cerullo's confession[1] which was used at his trial by the prosecution was voluntary beyond a reasonable doubt as required by Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); see also Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963).

1. Relator's confession actually consisted of two signed statements dated October 4, 1962.

As a practical matter, after all of the hearings and litigation in this case, this issue in turn rests most importantly on the question of Vincent Cerullo's physical condition on the morning of October 5, 1962 and on the previous day, October 4, 1962, when Cerullo signed the written statements which were used against him during his trial. Unfortunately, the man theoretically capable of rendering the best testimony in this area, one Dr. Alexander A. Vivona, who was the prison physician in the Nassau County Jail for a period of about 15 years and who examined Vincent Cerullo on the morning of October 5, 1962, is now deceased. More than that, as will appear hereinafter, there are other witnesses who, though still alive and available, have had a complete failure of recollection regarding events which are or may be relevant here.

In any event, I have considered the testimony which evolved at the hearing and, as well, by agreement of counsel, the testimony which took place before me a year ago this past fall on October 18 and 19, 1967. Finally, I have considered the trial record before Mr. Justice Farley in the Supreme Court of New York, Nassau County, which, by agreement of the parties, was considered to be the record of the hearing held in accordance with the mandate of People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

Without extended discussion, it is clear that the Court of Appeals of New York and the Court of Appeals for the Second Circuit have been principally concerned, for understandable reasons, with the testimony of Dr. Vivona at the trial of Cerullo. This testimony, or perhaps more accurately, selected portions of it, if believed, would tend to support the proposition that on October 5, 1962 Dr. Vivona found objective evidence of contusions of the right chest, lower anterior, upper abdomen and right side of the head. Dr. Vivona also testified that Cerullo's condition on October 5th "could have been produced by someone smashing their fist against his rib cage, but

he was unable to say when and how the injuries occurred". 393 F.2d at 881.

For convenience, analysis can be best made of the conflicting positions of relator and the state by discussing Cerullo's version of police coercion and brutality and, to the extent that it casts light on Cerullo's contentions, the testimony of his trial codefendant, Carmine Moccio, on the subject of his treatment the medical evidence; and the testimony of those officers who saw Cerullo during the crucial hours when he was being interrogated on October 4, 1962.

Including the testimony taken before me on the limited hearing in October, 1967, a total of twenty witnesses have appeared in this court to give evidence. In addition, stipulations were entered into by counsel to the effect that if they were called as witnesses, Detective Anthony Miraval and Mrs. Claudette Cerullo would testify as they did at the criminal trial before Mr. Justice Farley. It should be noted in this connection that during the hearing before me, counsel communicated with former state senator Irving Mossberg, now a civil court judge in Queens, with a view toward obtaining his testimony at the hearings this fall. It was stipulated by counsel that Judge Mossberg stated and would state if called as a witness that he has absolutely no recollection of this case or any of the significant events here in issue. Finally, it should be observed that Vincent Cerullo himself did not testify in the hearings before this court and thus presumably relied on the transcript of his testimony at his trial before Mr. Justice Farley and the jury.

### Cerullo's Arrest and the Events Thereafter.

Just prior to 3:00 a. m. on October 4, 1962, Nassau County Detectives Beirne and Skulnick went to petitioner's apartment in Brooklyn with two New York City Police Department detectives. They knocked on the door and, after being admitted to the Cerullo apartment, placed Cerullo under arrest. They then took Cerullo by automobile to the 71st

Precinct in Brooklyn where he was interrogated very briefly and booked. At about 3:30 a. m., the two Nassau County officers placed Cerullo in the left rear seat of their automobile and drove from Brooklyn to the 4th Precinct station located in Hewlett, Nassau County. Detective Skulnick drove the car; Beirne sat in the rear seat on the right of Cerullo. Despite Cerullo's testimony to the contrary, I specifically find that he was not handcuffed during this ride.

Prior to leaving the Cerullo apartment, Officer Beirne gave to Mrs. Cerullo the telephone number of the 4th Precinct in Hewlett.

The automobile arrived at the 4th Precinct at about 4:30 a. m. on October 4th. Cerullo was brought upstairs immediately to the commanding officer's squad room. He was offered coffee and sandwiches. He refused everything but coffee. Beirne thereupon questioned Cerullo off and on during the early morning. At about 5:00 a. m., Skulnick took over for Beirne and sat with Cerullo, questioning him from time to time. Again Cerullo drank some coffee.

On several occasions before 7:00 a. m. and after that hour, Captain Reeves W. Tuthill of the Nassau County police, who was the senior officer present during this investigation and the interrogations on October 4 and 5, spoke to Cerullo and asked several questions. At about 6:45 a. m. or 7:00 a. m., Detective Holmes spoke to Cerullo for the first time. Holmes' interview of petitioner lasted about 45 minutes. At about 7:45 a. m., Officer Carmine Altomare went into the room with Cerullo and told him that codefendant deFiore had implicated him in the crime. Sergeant Leo Ferrandis was in and out of the room briefly at about this point. Cerullo told Altomare that he would like to cooperate with the police but expressed concern as to what would happen to his wife if he did. Altomare said that he, Cerullo, should have thought of this before the robbery. Cerullo then agreed to talk, and he and Altomare got to work on the first statement which was finished later that morning. After the first statement was typed but before 11:00 a. m., Cerullo identified a piece of pipe brought in by another officer. He signed a second brief statement typed by Altomare and containing essentially his identification of the pipe. Toward the end of this process, Holmes came in and witnessed these two statements as signed by Cerullo.

At about 11:00 a. m. on October 4th, a lineup was conducted in which both Cerullo and Moccio were present, together with certain police officers and attendants in the building.

Cerullo was taken by automobile to the police headquarters in Mineola where he arrived at 12:50 p. m. on October 4th. He was processed and photographed by Detective Raymond Chmiel. Cerullo was logged out of Chmiel's office at 1:20 p. m. Detectives Holmes and McCartney then drove Moccio and Cerullo together to the First District Court of Nassau County in Mineola for arraignment. After some delay, apparently due to absence of court officials at lunch, the arraignment finally took place somewhere between 3:00 and 4:00 p. m.

After arraignment, Cerullo and Moccio were taken by automobile to the Nassau County Jail. Cerullo was booked in by Sergeant Tringali at 6:25 p. m. Moccio was booked in by the same officer at 6:33 p. m. Cerullo informed Tringali during the booking process that he had fallen in the police station and had sustained possible fractured ribs.[2] Tringali noted this on the pedigree sheet which he was filling out. Because the Nassau County Jail was unusually crowded that day, Cerullo and Moccio were not placed in cells. Rather, they were placed in an open bullpen known as the southeast cell block area where cots had been placed for a number of

---

2. Interestingly, Carmine Moccio, according to State Exhibit 7A, advised Dr. Vivona that he too had "fallen down", but the record does not indicate that Moccio said where he had fallen.

prisoners. Consequently, Cerullo and Moccio were able to move about rather freely and to converse with one another in this area during the evening of October 4 and the early hours of October 5, 1962.

### Cerullo's Trial Testimony

According to relator, he was not mistreated by the police at the 71st Precinct in Brooklyn. He testified at his trial, however, that when he was placed in the back seat of the auto for the trip from the 71st Precinct to Hewlett, his hands were handcuffed behind his back by Detective Beirne, who immediately thereafter struck him on the head with some object, at which point he lost consciousness.

Upon arrival at the 4th Precinct headquarters, Cerullo, according to his testimony, was handcuffed to a chair in a room on the second floor. Detective Beirne and Sergeant Ferrandis began punching him in the stomach. Detective Skulnick placed a thick telephone book on his head, whereupon Beirne took up a billy and repeatedly hit him on the head (through the book), thereby causing jarring pains through Cerullo's back.

A short while later, Detective Holmes came into the room. He and the other officers immediately spread-eagled Cerullo on the floor. Then "many detectives—big fellows" proceeded to repeatedly hit Cerullo in the stomach and in the area of his rib cage. This treatment persisted all night and into the morning when Cerullo first saw light come through the windows. Sometime in those early morning hours, the detectives are said by Cerullo to have arched him over the back of the chair and then continually punched him in his stomach once again.

Interestingly, Cerullo maintained that all during this treatment in the early morning hours of October 4, he continually screamed and cried out.

When Cerullo and Moccio were taken to police headquarters for photographing and then for arraignment in court, Holmes, according to Cerullo, told him that if he complained to the judge about his treatment, he, Holmes, would see that Cerullo got another beating in the Nassau County Jail.

Cerullo disputed the testimony of Sergeant Tringali and the entries made by that witness on the pedigree form at the Nassau County Jail on the evening of October 4th. According to Cerullo, he told Tringali that he was hurt and needed to see a doctor. He categorically denied telling Tringali that he had fallen down in the police station.

### Moccio's Hearing Testimony.

Carmine Moccio was produced on a writ ad testificandum and testified at the hearing before the undersigned this fall. As will be seen hereinafter, it is my view that Moccio's appearance, demeanor and testimony cast curious lights and shadows upon Cerullo's basic position in his petition for habeas corpus relief.

Among other things, Moccio testified that on October 3 at 6:30 p.m. he was brought by the police into the 4th Precinct headquarters in Hewlett. He was immediately taken upstairs into the squad commander's room where Detectives Holmes and Miraval proceeded to beat him for a considerable period of time. Specifically, he testified that Holmes continually kicked him in the stomach for about fifteen minutes or so. During this process, Moccio was "hollering loud".

During a respite in this beating, Moccio concedes that he telephoned to a relative in the presence of his parole officer, now Special Agent Quinn of the Federal Bureau of Investigation. He admitted on the stand that he did not complain to Quinn of any beating or brutality at the hands of the Nassau County police.

Detective Holmes returned sometime after the phone call. According to Moccio, Holmes then proceeded to punch him all over his body, except the face, and in the process wrestled him to the ground.

There was then a third episode of beatings of Moccio at the hands of Holmes and Miraval. In Moccio's version, both officers "worked him over" for a considerable period of time during which he continually screamed at the top of his voice. Finally at the end of this third episode of brutality, Moccio gave in and confessed.

### The Medical Evidence.

As already indicated, the various courts that have had occasion to consider the issue raised here have focused for understandable reasons upon the testimony of Dr. Alexander Vivona who in October, 1962 was and had been the Nassau County Jail physician for approximately fifteen years. There is no dispute that Vivona examined both Moccio and Cerullo on Friday morning, October 5, 1962.

Confessedly, I find Dr. Vivona's testimony, when read as a whole, to be ambivalent. No doubt this in part is because, as he conceded on the witness stand at the trial, he had no independent recollection whatsoever of the examinations of Moccio and Cerullo.[3] Dr. Vivona's written report respecting Cerullo shows in significant part:

"I. Contusion of right chest, lower part of anterior.

II. Contusion of upper abdomen and right side of head.

Rx chest strapped 6" foam rubber bandage * * *"

Returning to Dr. Vivona's trial testimony, he stated that he could not tell if Cerullo's injuries were recent or whether they took place a week or two prior to October 5. He also testified that Cerullo's contusions were not visible —i. e. there were no bruises in the classic, lay sense of that term. Put differently, Vivona defined contusions to be subcutaneous injuries.

The doctor also testified that he saw Cerullo again on October 15 and found him improved to the point where he expected that after a few more days Cerullo could stop wearing the foam rubber bandage or support mentioned in his written report.

Parenthetically, it should be noted that according to Vivona's report, Cerullo told him that he had fallen in the police station. (See fn. 2, supra.) Further with respect to Carmine Moccio's examination on the same day, Dr. Vivona diagnosed his condition as a contusion in the lower abdomen. As I read the Vivona testimony, this diagnosis was based on the subjective complaints of Carmine Moccio and palpation by the doctor of the lower abdomen. (Trial Transcript, pp. 277–78).

After considerable effort, the district attorney of Nassau County finally identified and located Dr. Robert S. Goldstein, who appeared on October 14, 1968 before this court and testified that in 1962 he was a young intern at the Meadowbrook Hospital in Nassau County. On October 9, 1962, according to the records of that hospital, he was the intern who examined Cerullo. Goldstein stated at the hearing, however, that he had no recollection of this event even after seeing the record on which concededly appears his signature (State Exhibit No. 1). According to this record, X-rays were taken of the rib cage of Cerullo and proved negative. The report also states that Cerullo "complains of being injured physically". Dr. Goldstein testified that in examining the report language, he is convinced from his regular practice that this report was based upon the subjective complaints of the patient. He also said that if Cerullo had sustained visible contusions or bruises, he would have so noted specifically on his report. Dr. Goldstein could not recall seeing Cerullo wrapped in a

---

3. Moreover, the testimony of Dr. Vivona was rather abruptly terminated by order of the trial court, apparently because the witness had to make an appointment. Concededly, further questioning may not have led to further enlightment. Nevertheless, in hindsight, it is tempting to think that Dr. Vivona could have clarified certain matters such as his customary methods of examination.

foam rubber bandage; indeed, he testified that he has never seen any such contraption in all of his medical practice.

### The Testimony of the Nassau County Police Officers.

With the exception of Detective Miraval, as heretofore noted, all of the officers who dealt directly with Cerullo on the days in question or who were present in adjoining rooms on the second floor of the 4th Precinct, appeared at the hearing before this court and testified.

Without extended discussion of the details of their testimony, suffice it to note here that Detectives Holmes, Beirne and Skulnick all testified once again at this hearing substantially as they did at the trial to the effect that they did not in any way strike or coerce or mistreat Cerullo or Moccio. Such, of course, was the testimony of Detective Miraval at the trial, which I have noted and considered by agreement of counsel.

Of perhaps greater significance to me, Special Agent William J. Quinn of the Federal Bureau of Investigation testified before me on October 18, 1967 about the events on October 3 and 4, 1962 when he was a New York State parole officer.

Quinn arrived at the 4th Precinct between 6 and 7:00 p. m. on the evening of October 3rd. He left that place between 2:30 and 3:00 a. m. on the morning of October 4. He spoke to Cerullo on several occasions. He saw no bruises or marks on Cerullo's body. Cerullo made no complaints to him of beatings or threats or any other improper conduct by the police. I found Quinn to be a very frank and impressive witness. More than that, I can conceive of no reason why he today would wish to conceal or distort the true events as he observed them in relation to Vincent Cerullo.

Another persuasive witness at the hearing was Mr. Arthur Duffy, now an employee of American Express Company, and in October, 1962 a special agent of the Federal Bureau of Investigation. Cooperating in this investigation, Duffy went on official business to the 4th Precinct in Hewlett at about 8:30 p. m. on October 3. He left there the following morning at about 10:30 a. m. Duffy had occasion to see Cerullo when he was brought in about 4:30 a. m. on October 4. He also saw petitioner again briefly at 10:30 or 11:00 that morning when Cerullo was in the lineup. Most significantly, Duffy testified that he was in the sergeant's room on the second floor adjacent to the room where Cerullo concededly was being interrogated. Although, according to Duffy, the door to that room was closed most of the time, he never heard any evidence or signs of a scuffle or a beating. He heard no screams or cries from any human being.

A somewhat different type of witness, though certainly not disinterested, made an impression upon me at the hearings in this case. That was Reeves W. Tuthill, now retired and living in Vermont, and in October, 1962, the supervising captain of the 1st, 4th and 5th Squads of the Nassau County police. Tuthill on the evening of October 3 went to the 4th Precinct in Hewlett. He stayed there throughout that evening and all of the morning of October 4th. As already indicated, he saw Cerullo brought in at about 4:30 a. m. and later that morning conversed with Cerullo briefly several times before and after breakfast. He testified that he never struck Cerullo nor did he ever hear any sounds of a scuffle or a beating. Similarly, he heard no outcries or screams.

### The Testimony of Cerullo's Wife and Brother.

Relator's brother, Lawrence Cerullo, appeared as a witness at the hearing this fall. On the basis of his demeanor and the obviously contrived statements he made while on the witness stand, I specifically find that his testimony is unworthy of belief.

Mrs. Cerullo, as indicated heretofore, did not testify at the hearings before

me. As I view her trial testimony, it sheds little light on the difficult issues here for decision except to indicate that she telephoned the number given to her by Detective Beirne at about 9:00 a. m. on October 4, only to be told by some officer 'that her husband Vincent was not there at the 4th Precinct.

*Ultimate Findings and Discussion.*

As I appraise all of the available evidence, between the time of Cerullo's arrest at his apartment in Brooklyn in the early morning hours of October 4, 1962 and his delivery to gaol at 6:25 p. m. on that day, there is no direct evidence, saving the highly colored account of relator, that he was mistreated, beaten or brutalized by any representative of the Nassau County police or any other person who might be said to represent the state or county. There can be no doubt that Cerullo was subjected to extensive questioning beginning shortly after 4:30 a. m. and continuing on up to about 11 o'clock that morning when he finally signed the two statements. The difficulty, when all is said and done, is that I cannot be certain just how and when Vincent Cerullo sustained the injuries which Dr. Vivona claimed to have found and noted in his report.

It is true that I find the tales of Moccio and Cerullo to be considerably exaggerated and thus to that extent incredible. Indeed, I have deep suspicions as to what might have gone on between Moccio and Cerullo during their confinement together in the southeast cell block area in the Nassau County Jail. Yet there is nothing in the record to demolish or explain away the testimony of Dr. Vivona. However ambivalent I may think it is, those portions of that testimony which contain evidence of objective findings of contusions on Cerullo's ribs and head have not been refuted or explained. Similarly, despite recognition of the possibilities that Cerullo was injured before his arrest or that injuries were inflicted by him alone or in connivance with Moccio in the evening of

October 4 and early hours of October 5, I cannot find that the state has proved such possibilities.

As Judge Burke stated in his dissenting opinion, 18 N.Y.2d 842–844, 275 N.Y.S.2d 848–850, 222 N.E.2d 607–609, New York law requires that once Cerullo's injuries have been established, the state has the burden of satisfactorily explaining them in order to support admission of the statements into evidence. See People v. Valletutti, 297 N.Y. 226, 78 N.E.2d 485 (1948); People v. Barbato, 254 N.Y. 170, 172 N.E. 458 (1930). I cannot say that the state has carried its burden after all these additional hearings. Put differently, I cannot rule that the trial judge could have found that these statements or confessions of relator were voluntary beyond a reasonable doubt before submitting them to the jury. Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964); People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965); see also People v. Cerullo, 18 N.Y.2d 839, 842, 275 N.Y.S.2d 845, 848, 222 N.E.2d 605, 607 (1966) (dissenting opinion of Burke, J.).

The circumstances as I find them after the hearings can be succinctly summarized as follows. Relator's version of beatings is so highly colored as to be suspect, at least with respect to the details. The denials of the police officers who have testified are not clearly incredible. The testimony of presumably disinterested witnesses Quinn and Duffy is credible in my view, but I must recognize that some kind of beating or coercive conduct, though not the kind described by Cerullo, could possibly have taken place without their knowledge. It is possible that Cerullo, either alone or with Moccio's help, could have administered to himself the contusions, evidence of which Dr. Vivona testified he discerned or found on October 5, 1962. It is also possible, of course, that Cerullo was injured at a time before his arrest. Nevertheless, there remains the smid-

gin[4] of doubt created by Dr. Vivona's testimony which, as I have already observed, is not explained by the state. That smidgin, however, is sufficient to create a reasonable doubt and to require under the applicable law, already discussed, that Cerullo's conviction be set aside.

Relator's application for a writ of habeas corpus is granted, but petitioner may be retained in respondent's custody for a period of sixty (60) days, upon expiration of which he shall be released unless he is brought to a new trial within that time.

Settle order accordingly.

---

4. Alternatively, "smidgen" or "smidgeon". See Webster's Third New International Dictionary, p. 2151.