[Crim. No. 6715. In Bank. Dec. 26, 1961.]

THE PEOPLE, Plaintiff and Respondent, v. LAWRENCE
CHRISTOPHER GARNER, Defendant and Appellant.

138

Gregory S. Stout, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

McCOMB, J.—This is an automatic appeal from a judgment of guilty of murder in the first degree on two counts after trial before a jury. The jury fixed the punishment at death.

Viewed in the light most favorable to the People, the record discloses the following facts:

On September 4, 1959, defendant, who subsequently on September 15, 1959, married his codefendant, Sandra Garner, attended a drunken party at Clifford Red's apartment in Inglewood, California. Included among the guests were Richard (Rick) Nowlen and Patricia (Pat) Hurley, with whom Clifford Red, Sandra, and defendant had participated in a robbery earlier that evening.

Defendant stayed with Rick and Pat at a motel after the party. He went back to Clifford Red's apartment about 11:30 a. m. on September 5, 1959, but then left for a while, returning about 5 p. m.

Pat and Rick then arrived at Clifford Red's apartment, and an argument developed over the division of the proceeds of the robbery.

Defendant and Sandra left the apartment about 6 p. m. and returned about 8:30 p. m. Defendant had taken Rick and Pat's .45 and .32 caliber weapons with him. He replaced the weapons when he and Sandra returned to the apartment.

Since the middle of August, Pat and Rick had been hiding out from the police. During most of the time they had stayed with Clifford Red and Sandra, but for a few days they stayed at the home of defendant's girl friend in San Bernardino. In each instance they had promised to pay a large sum of money for room and board, but had failed to do so.

Defendant had had an argument at the motel with Rick that morning, and Rick had threatened to involve defendant in some sort of an escapade or to involve his mother and his girl friend. Defendant then decided that there was no way out of his relationship with Rick except to kill him and Pat.

That afternoon, September 5, 1959, he talked Rick into agreeing to accompany him to Las Vegas with Pat and Sandra. When they left later that evening, defendant drove the car, Sandra was in the front seat, and Rick and Pat were in the back seat.

They drove in a desert area toward Las Vegas. En route, they stopped at Adelanto, in San Bernardino County. Defendant told Rick and Pat to go to sleep, and said he wanted to get acquainted with Sandra. After a while, defendant and Sandra got out of the car and walked around the area. They later took another walk so that defendant could look over the highway and traffic conditions. When they returned to the car, defendant remembered there were bottles in the back seat

on the floorboard and decided on a plan to get possession of Rick and Pat's pistols.

After defendant coaxed him awhile, Rick gave him a pistol fully loaded. Defendant then set up the bottles and commenced firing the weapon. He missed purposely, because he knew Rick was watching and would get out of the car to show him how to shoot. After emptying the pistol, defendant went back to the car and got another clip, and Rick followed him with the .32 caliber weapon in his possession.

Defendant continued firing the .45 caliber, and Rick fired the .32. Both men reloaded, and defendant fired two shots, breaking one bottle and nicking another. Defendant set up more bottles, and Rick was standing behind him. After placing the bottles, defendant walked toward Rick, brought up the weapon, and fired, shooting him in the stomach. Rick fell over backwards and dropped the weapon he had been holding. Defendant told Rick he was sorry but there was no other way. Rick pleaded with defendant, but defendant shot him through the top of the head.

Defendant then awakened Pat and told her there had been an accident and Rick had been hurt. When she ran over to Rick, defendant followed her and shot her in the back of the head.

A few days later defendant and Sandra fled to Mexico. The day after they reached Mexico the automobile in which they were driving was wrecked in an accident. Defendant reported the matter to the federal authorities and was subsequently called in for questioning. Later two officers from the San Bernardino Sheriff's Office, Inspector Oxnevad and Lieutenant Mathewson, flew to Mexico in an investigation of the murders. After these officers contacted the Obregon Police Department in Mexico, agents of the department arrested defendant, ostensibly for investigation regarding his identification documents and the automobile accident in which he had been involved.

During defendant's detention in Mexico, Inspector Oxnevad advised him that he was going to ask the Mexican authorities to hold him pending extradition and that he would call his office and ask for issuance of a warrant of arrest, at which time defendant stated, "Well, I will go back with you freely and voluntarily, I don't want to lay around in any Mexican jails."

The next day defendant and Sandra were escorted by the Mexican immigration officers across the border into Arizona. Inspector Oxnevad and Lieutenant Mathewson, who had pre-

viously been informed that defendant and Sandra were going to be put out of Mexico, were waiting for them there. They then placed the two under arrest and took them to a courthouse in Arizona. From there they were returned to California.

Defendant contends: First: *That the trial court was without the power to try him for the alleged murders because of the method used by the arresting officers in bringing him to California.*

This contention is devoid of merit. It is immaterial whether there was a compliance with the Mexican extradition laws or Arizona laws on arrest and extradition. California follows the federal rule relative to the trial of a defendant who has been obtained from outside the jurisdiction of this state. The rule is that it is immaterial whether a defendant has been forcibly seized in another country or state and transferred to this state by violence, force, or fraud for trial for an offense alleged to have been committed in this state, there being no provision in the Constitution, laws or treaties of the United States which guarantees him any protection in such transaction. (*Ker* v. *Illinois,* 119 U. S. 436, 443 et seq. [7 S.Ct. 225, 30 L.Ed. 421] ; *Frisbie* v. *Collins,* 342 U. S. 519, 522 [72 S.Ct. 509, 96 L.Ed. 541] ; *In re Jones,* 54 Cal.App. 423, 426 [201 P. 944] ; 35 C.J.S. (1960) Extradition, § 47, p. 477 et seq.)

In *Frisbie* v. *Collins, supra,* the Supreme Court of the United States said, at page 522 : "This Court has never departed from the rule announced in *Ker* v. *Illinois,* 119 U. S. 436, 444 [7 S.Ct. 225, 30 L.Ed. 421], that the power of a court to try a person for crime is not impaired by the fact that he had been brought within the court's jurisdiction by reason of a 'forcible abduction.' No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will."

Second: *That he was not promptly arraigned and that during the interval he made certain confessions which should not have been received in evidence.*

This contention is devoid of merit. Defendant was arrested on Friday, September 18, 1959, in Arizona. He was arraigned

in municipal court on Tuesday, September 22, 1959. Thereafter, on October 6, 1959, an indictment was returned against him, and he was arraigned thereunder on October 9, 1959, with court-appointed counsel representing him.

It is settled in this state that where, as in the instant case, a pretrial confession is voluntarily made, it is admissible in evidence so far as due process is concerned. (*Rogers* v. *Superior Court*, 46 Cal.2d 3, 9 [9] et seq. [291 P.2d 929].) In *Rogers* v. *Superior Court, supra,* the defendant had not been taken before a magistrate until eight days after his arrest, well beyond the 48-hour statutory maximum; but his voluntarily made pretrial confession was nevertheless held properly received.

The record here discloses that each confession given by defendant was freely and voluntarily given, without threats or promises by law enforcement officers. Therefore, they were properly received in evidence by the trial court.

Third: *That there was a failure upon the part of the prosecution to comply with certain of the pretrial discovery orders.*

This contention is also devoid of merit. Defendant argues that a handwritten confession given by him on October 5, 1959, and a tape-recorded joint confession given by him and his codefendant, Sandra, on October 6, 1959, "burst upon defense counsel as a complete and utter surprise."[1]

■ Defendant's trial counsel was entitled to inspect, view, hear, or copy any and all statements of defendant, and such was the order of the trial judge in discovery proceedings had before the trial.

This right extended to the joint confession given by defendant and his codefendant. (*Cash* v. *Superior Court,* 53 Cal.2d 72, 75 [1] et seq. [346 P.2d 407]; cf. *Vance* v. *Superior Court,* 51 Cal.2d 92, 93 [1] [330 P.2d 773].) Any inference to the contrary in *Schindler* v. *Superior Court,* 161 Cal.App.2d 513 [327 P.2d 68], is disapproved.

■ The district attorney, however, was not required to seek out defendant's trial counsel and present the statements to him for inspection. Rather, it was the duty of defendant's trial counsel to go to the office of the district attorney and inspect the statements available to him there.

The record shows that defendant's trial counsel did not perform this duty with respect to the handwritten confession. It shows the following statement by Mr. Turner, the assistant

---

[1]Defendant is represented on this appeal by different counsel from that in the trial court.

district attorney: "Mr. Bailin [defendant's trial counsel] came to my office on perhaps two or three occasions, very briefly, in connection with this case. Mr. Bailin asked me at one time to furnish him with copies of the documents which were not also on tape. I advised Mr. Bailin that my office did not have the facilities for copying these very lengthy documents, and made to him the same offer that I had made to Mr. Hartley [counsel for Sandra Garner], that Mr. Bailin would bring his Stenorette machine and tape, and I understood that he also used the Stenorette dictation machine; that I would furnish him a room and lend him my Stenorette dictation machine, and he could copy all of the statements which we have.

"This was never done. Mr. Bailin requested that because of his lack of time that he had been furnished with copies of those matters which were on tape, that he was asked to furnish the tapes, the large tapes to be used by the Sheriff's office for making copies, and I believe he did, and I understood, and I allege on that basis that because the tapes which he furnished were not in the best condition, the Sheriff's office made copies of some of the statements relating to his client on Sheriff's office tapes which they furnished to him. I do not know, of my own knowledge, exactly what Mr. Bailin did get copies of, since I was not present at any of the occasions on which he received copies. I do know of my own knowledge that he at no time came to my office and copied anything out of my file.

". . . At no time has Mr. Bailin asked me whether he had copied all of the statements; at no time has he advised me what statements he did, in fact, have, and at no time has he asked me whether there were other statements which he had not seen. Our office has been ready at any and all times suiting his convenience to permit him to copy any statements made by his client."

Defendant refers to the fact that at one time Sandra's counsel asked the district attorney's office for a list of statements, by dates, made by both defendant and Sandra, and that the list given him contained no reference to any material of October 5 or October 6, 1959. Actually, the list did refer to the tape of October 6, 1959. It is evident, however, that any omission on the list could not have prejudiced defendant, since his attorney had not asked for the list.

No objection was made in the trial court to the introduction in evidence of the tape-recorded joint confession on

the ground that defendant's counsel had not been afforded an opportunity to hear it before the trial, and it is clear from the record that there is no basis for contending that the tape was a surprise to defendant's trial counsel.

In the first place, the list which the district attorney's office furnished counsel for Sandra contained a notation that a tape was made on October 6 between 3:30 and 5:20, and counsel for Sandra testified that he notified defendant's trial counsel of the list.

Furthermore, over two weeks before the commencement of the trial, while counsel were arguing a motion for separate trials, the assistant district attorney, in support of his argument against separate trials, stated: "I feel that particularly in view of the fact that their confessions which I still say are in all major points in agreement, in addition to those they have made one joint confession which they both join in it and in which they describe what happened. . . ."

In addition, it appears that defendant's trial counsel actually heard the tape before the trial. During the discussion which followed the objection of defendant's trial counsel to the introduction of the handwritten confession, the assistant district attorney, after relating the failure of defendant's trial counsel to inspect defendant's written statements, said: "Mr. Bailin and Mr. Hartley came to the Sheriff's Office, I am told, on Saturday or Sunday, when I wasn't here, but with my blessings, of course, and heard a tape recording which is yet to be offered."

The tape-recorded joint confession was the only tape thereafter introduced in evidence, and, as stated above, when it was introduced no contention was made that defendant's trial counsel had not been given an opportunity to hear it in advance of the trial. It seems clear, therefore, that it was the tape which defendant's trial counsel had heard some time beforehand.

It should also be noted that defendant's handwritten confession contained the same matter as the joint confession, which defendant's trial counsel had heard, as appears from the following statement which he made at the time he objected to the introduction in evidence of the handwritten confession: "I do believe, however, as a result of the order of Judge Fogg [the discovery order] and in all fairness in connection with this case, that the item which has been marked 48 [defendant's handwritten confession] should be suppressed; it is cumulative in nature with the other materials that have been pre-

sented, and I doubt that its suppression could hurt his [the district attorney's] case."

It thus appears that the course pursued did not result in any prejudicial error to defendant.

Fourth: *That various confessions of defendant were "obtained in return for favors granted or withheld at the discretion of law enforcement officials" and that the trial court erroneously instructed the jury with respect to the standard by which the voluntariness of the confessions was to be determined.*

This contention is not well taken. The record discloses that each of the confessions received in evidence was freely and voluntarily made, without duress, inducement, or promise of reward. (*People* v. *Crooker,* 47 Cal.2d 348, 352 [1] et seq. [303 P.2d 753]; *People* v. *Nagle,* 25 Cal.2d 216, 223 et seq. [153 P.2d 344]; *People* v. *Grace,* 166 Cal.App.2d 68, 71 [2a] et seq. [332 P.2d 811].)

*Rogers* v. *Richmond,* 365 U. S. 534 [81 S.Ct. 735, 5 L.Ed. 2d 760], relied on by defendant, is not applicable to the present case. The defendant in that case was, by a ruse, led to believe that his wife, who suffered from arthritis, was about to be taken into custody, and he confessed in order to spare her from being transported to the scene of the questioning.

In reversing the judgment of conviction, the United States Supreme Court said, at page 741 [4-6] of 81 S.Ct.: "From a fair reading of these expressions [the trial court's instructions to the jury], we cannot but conclude that the question whether Rogers' confessions were admissible into evidence was answered by reference to a legal standard which took into account the circumstance of probable truth or falsity. And this is not a permissible standard under the Due Process Clause of the Fourteenth Amendment. The attention of the trial judge should have been focused, for purposes of the Federal Constitution, on the question whether the behavior of the State's law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined—a question to be answered with complete disregard of whether or not petitioner in fact spoke the truth. The employment . . . of a standard infected by the inclusion of references to probable reliability resulted in a constitutionally invalid conviction, pursuant to which Rogers is now detained 'in violation of the Constitution.' "

The instructions in the present case, on the other hand, contain no suggestion that the probable reliability of the

confessions was a factor to be considered in determining their voluntariness.

Defendant contends that the delay in his arraignment beyond the legally prescribed time, an alleged failure to grant his request to contact an attorney, and permission given him to see his wife allegedly with the understanding that he would make a statement were all factors tending to establish ''implied coercion.'' He then argues that the instruction given setting out the factors to be considered in determining whether a confession is involuntary was erroneous in that it did not cover the subject of implied coercion as such coercion might be found from any or all of the facts enumerated.

The trial court had instructed the jury as follows: ''The law absolutely forbids you to consider a confession in determining the innocence or guilt of a defendant unless the confession was voluntarily made, and although the court has admitted evidence tending to show that defendant made a confession, you must disregard the asserted confession entirely unless you, yourselves, by your own weighing of all the evidence, your own judging of the credibility of witnesses, and your own reasonable deductions, conclude that the alleged confession not only was made, but was voluntary.

''A confession or an admission is involuntary when it is obtained by any sort of violence or threats, or by any direct or implied promises of immunity or benefit, or by any improper influence which might induce in the mind of the defendant the belief or hope that he would gain or benefit or be better off by making a statement, and when the defendant makes such confession or admission as the result of any such inducement originating with a law enforcement officer. But, even though a confession or an admission is made under a hope or belief of benefit, it will not be involuntary if such hope or benefit originated in the mind of the defendant solely, or was induced solely by the advice or counsel of a relative, attorney, or other person not connected with law enforcement.''

Even if we assume that the above instruction would be inadequate if there was evidence that a confession was given as a result of ''implied coercion'' not constituting the type of action specified by the instruction as rendering a confession involuntary, this would be of no avail to defendant, as the record does not support his contention that any such coercion existed.

 As hereinabove pointed out, the rule is settled in this state that a pretrial confession given during a period of illegal detention is admissible in evidence, so far as due process

is concerned, if it was voluntarily made. (*Rogers* v. *Superior Court, supra,* 46 Cal.2d 3, 9 [9] et seq.) ▮ As was said in the *Rogers* case, at page 10, "The voluntary admission is not a necessary product of the illegal detention. . . ." ▮ But even if the earlier confession might have been found involuntary by the jury because of delay in the arraignment, the record discloses that defendant was arraigned before the committing magistrate on September 22, 1959, and at that time counsel was appointed to represent him. On October 5 and 6, 1959, he made three confessions, one in the presence of his wife, and there is nothing in the record that would support a finding that these confessions were influenced by the earlier delay in bringing him before a magistrate and appointing counsel to represent him.

With respect to defendant's alleged request that an attorney be contacted for him, defendant testified that as Inspector Oxnevad, Lieutenant Waite, and he were walking upstairs after his interrogation on September 18 at a substation of the sheriff's office at Victorville, another officer informed them that defendant's mother (to whom a telephone call had been placed at defendant's request) was on the telephone. Although defendant was not allowed to speak with her, Inspector Oxnevad told him that he would give her whatever information defendant desired. According to defendant's testimony, he requested that she be told to have Gladys Root, of Los Angeles, his attorney, come out there. When asked whether or not the message was ever communicated to his mother, defendant replied, "My mother said no."

There was no testimony that Inspector Oxnevad told defendant he would not, or did not, relay the message, and from defendant's reply it may be assumed that it was not until he had contact with his mother at a later date that he learned his alleged request had not been communicated to her.

Continuing, defendant testified that he told Lieutenants Keene and Waite at the Victorville substation that he had the cards of two attorneys and asked that Mrs. Root be called, to which he received the reply, "We will do that later." He then testified: "After Waite talked to me upstairs . . . about five or 10 minutes there at the door, I told him, 'All right, I will make a statement.'" Defendant's willingness to confess so shortly after receiving, as he put it, "a stall" on his request that Mrs. Root be called hardly shows that he was coerced into giving the confession as a result of the officers' alleged actions.

With respect to defendant's contention that he was coerced into giving his handwritten confession by a promise made by the sheriff that he could have a visit with his wife if he gave the statement, the sheriff denied making any such agreement.

Defendant, however, testified that on October 5 he sent for the sheriff, told him that he would tell the truth and he wanted to see his wife, and reminded the sheriff that the latter had promised in Victorville that he could have a visit with his wife. Defendant then testified: "He [the sheriff] said, 'Write the statement and I will let you see your wife.' I said, 'I want to see my wife.' I said, 'This statement, here, is started and I will finish it, but I want to see my wife.' He said, 'You go ahead back to the cell and finish it.' And he told the jailer I had that pad and pen, so he would know, and then I went back to the segregation unit and lay down on my bunk and tossed the pad on the floor along with the pen. He came back a couple of hours later and asked me if I was finished and I said, 'No, you can take the pad back if you want, but I want to visit my wife.' He said, 'In the morning. You go ahead and write it and I will let you visit your wife.' After chow in the morning they got me out of my cell and took me to the back and I had an hour and 20 minute visit with my wife."

Thus, it will be seen that even under defendant's version of what occurred the sheriff agreed only that defendant could see his wife after he *finished* the statement. However, defendant was allowed to see her before finishing it, and it was four hours after his conference with his wife had ended before he completed the lengthy statement and gave it to the sheriff. This falls far short of proof that defendant gave the statement in return for permission to see his wife.

The court also instructed the jury as follows: "The fact that a defendant was under arrest at the time he made a confession or an admission or that he was not at the time represented by counsel or that he was not told that any statement he might make could or would be used against him or that he was told that others had made statements implicating him in the crime, will not render such confession or admission involuntary."

Defendant contends that even though this instruction was proper in itself, the court erred by not further instructing the jury that these factors might be considered together with other evidence bearing on the voluntariness of defendant's confession. Such an instruction, however, would be relevant only

when there is evidence showing these factors to be part of an overall pattern of coercion or other improper influence, and, as hereinabove pointed out, the record does not support defendant's contention that any such coercion or influence existed.

▮ Fifth: *That the admission into evidence of confessions made by defendant after his arraignment or indictment, outside the presence of his counsel, was a denial of the right to counsel and a violation of the due process clause of the Fourteenth Amendment.*

There is no merit to this contention. The absence of a defendant's counsel at the time he freely and voluntarily makes a confession, without threats, force, duress, or promise of reward, does not of itself render the confession inadmissible and in violation of the due process clause of the federal Constitution. (*State of Oregon* v. *Kristich*, 226 Ore. 240 [359 P.2d 1106, 1110 et seq.]; cf. *Rogers* v. *Superior Court*, 46 Cal. 2d 3, 10 [11] et seq. [291 P.2d 929].)

We concur with the statement of Mr. Justice Sloan in *State of Oregon* v. *Kristich, supra,* at page 1110 [359 P.2d]: "We think each case must be examined to determine if a failure to provide or to permit an accused to consult counsel in existence would have violated constitutional rights or otherwise impaired the voluntary character of an admission. Therefore, we must consider the facts in this case."

The record discloses that on October 5, 1959, the sheriff received a note from his jailer that defendant wished to speak with him. Pursuant to this request, the sheriff visited defendant at the jail, at which time defendant stated that he would tell him the truth regarding the killings. After making a confession orally, defendant agreed to write it in his own handwriting. Defendant began writing, but then requested permission to go to his cell and take his time to complete it.

Later that evening the sheriff visited defendant in his cell and asked him if he had finished his confession. Defendant replied that he was tired and that he would finish it in the morning.

The next day at 7:30 a. m. the sheriff asked defendant, in effect, if he had finished the written confession. Defendant replied that he had not. The sheriff then told him he would pick it up later.

At 7:45 a. m. Sandra was brought to a room in the jail, and defendant was permitted to talk with her there for an hour and twenty minutes.

At 12 noon the grand jury returned the indictment under which defendant was tried.[2]

About 1 p. m. the sheriff again asked defendant if he had finished the statement. Defendant replied that he had about one page more to write, and he then completed it in the presence of the sheriff. At the sheriff's request, he read the statement aloud and then handed it to the sheriff. Defendant had dated the statement October 5, 1959.

The sheriff asked defendant if he would be willing to make the same statement in the presence of Sandra, and defendant said that he would.

Later that afternoon Sandra was brought to the homicide office, where the sheriff read parts of defendant's statement to her. He asked her if it was the truth and told her defendand had given him the statement. To this Sandra replied that she would have to hear defendant say it.

Defendant was then brought to the homicide office. The sheriff again read part of his statement to Sandra and asked defendant if he had not written it. Defendant replied in the affirmative and, turning to Sandra, said, "We might as well tell the truth."

At 3:30 p. m., within five or ten minutes of the time defendant had entered the room, the making of a tape recording was begun.

The tape shows that Lieutenant Keene first made a few preliminary remarks to record who was present and then stated: "We have brought both of you down here to the Homicide Division, and we understand that you are willing to tell us exactly what occurred on Saturday night, September the 5th, and early Sunday morning, September the 6th, at the time that Richard L. Nowlen, known as Rick Nowlen, and Patricia Hurley Skene, known as Pat, how they met their death, and who is responsible. Are you willing, the two of you, to relate the facts to us, as to exactly what occurred on that Saturday evening and early Sunday morning?"

Both defendant and Sandra answered in the affirmative and acknowledged that the statements they were about to make were free and voluntary and were being made without any promises of reward or immunity of any kind. They then gave their accounts of the crimes, with some interrogation by Lieutenant Keene from time to time regarding details.

In support of his contention that his constitutional rights

---

[2]It will be recalled that defendant had been arraigned on September 22, 1959, under the information originally filed against him.

were violated by the taking of the confessions outside the presence of his attorney, defendant relies on two recent New York cases, *People* v. *Di Biasi,* 7 N.Y.2d 544 [166 N.E.2d 825], decided by the Court of Appeals of New York, and *People* v. *Waterman,* 12 App.Div.2d 84 [208 N.Y.S.2d 596], decided by the Supreme Court of New York, Appellate Division, and directs our attention to the concurring opinions in *Spano* v. *New York,* 360 U. S. 315, 324 et seq. [79 S.Ct. 1202, 3 L.Ed.2d 1265].

▆▆▆▆ Those cases, however, are distinguishable from the instant case, and none of them stands for the proposition that where, as here, a defendant who has been apprehended and charged with a crime volunteers to make a confession, and he does so, outside the presence of his attorney, with no persistent grueling on the part of interrogating officers, his constitutional rights have been violated.

In *Spano* v. *New York, supra,* the defendant, after indictment for first-degree murder, retained counsel and surrendered through the instrumentality of his attorney, who advised him not to make any statements. He was subjected to persistent and continuous all-night questioning for almost eight hours by an assistant prosecutor and numerous police officers, including a personal friend who was a fledgling policeman and importuned him to confess. He finally did confess, after having repeatedly requested, and been denied, an opportunity to consult his attorney.

It was held that on the record in that case the defendant's will was overborne by official pressure, fatigue, and sympathy falsely aroused and that therefore the confession was not freely and voluntarily made and its admission into evidence violated the due process clause of the Fourteenth Amendment.

The majority specifically declined to rule on the defendant's contention that following indictment no confession obtained in the absence of counsel can be used without violating the Fourteenth Amendment.

The concurring opinions discuss the latter question. It is clear, however, that what is there condemned is the obtaining of a confession as a result of the persistent grueling of a defendant in secret after he has asked for his attorney and his request has been denied.

The confession in the *Spano* case was given after hours of persistent grueling by law enforcement officials, during which the defendant had steadfastly refused to answer, and unquestionably resulted from the grueling. In the present case, on

the other hand, the confessions were not made as a result of any grueling of defendant.

As heretofore pointed out, defendant had sent word to the sheriff that he wanted to see him, and upon the sheriff's arrival voluntarily gave what he then insisted was a true account of the crimes. Clearly this confession was not the result of any grueling of defendant.

The same thing is true of defendant's handwritten confession. Written for the most part while he was alone in his cell, it involved no interrogation of any nature.

There was some interrogation of defendant and Sandra at the time they made their joint oral statement later that afternoon; but in the very beginning of the interview they had indicated their willingness to tell exactly what had occurred with respect to the killings, and by no stretch of the imagination can it be said that such interrogation constituted grueling which resulted in defendant's confessing his guilt.

Futhermore, at no time did defendant request an opportunity to consult his attorney, as the defendant in the *Spano* case had.

In *People v. Di Biasi, supra,* as in the *Spano* case, the defendant, after indictment for murder, had retained counsel and had voluntarily surrendered through the instrumentality of his attorney. Subsequently he was questioned by several police officers and an assistant district attorney in the absence of his own attorney and made certain damaging admissions. It is clear that the defendant had not requested the interview or expressed any desire to make a statement.

In the present case defendant did not voluntarily surrender but was apprehended, and he had expressed a desire for an interview and an opportunity to make a statement.

In *People v. Waterman, supra,* the defendant had been apprehended, but, unlike the present case, he had not solicited the presence of the law enforcement official to whom he made his confession or expressed any desire to make a statement.

Shortly after handing down its decision in *People v. Di Biasi, supra,* the Court of Appeals of New York decided the case of *People v. Downs,* 8 N.Y.2d 860 [168 N.E.2d 710]. In that case the defendant had not surrendered, as the defendant in the *Di Biasi* case had, but had been apprehended after his indictment. He then gave statements to the arresting officer, two detectives who had gone to Florida to take him into custody, and the prosecutor. Although all these statements were received in evidence, the judgment of conviction was affirmed.

This makes it clear that the Court of Appeals had not held in *People* v. *Di Biasi, supra,* as contended by defendant, that a defendant has an absolute right to representation by counsel during questioning after indictment.

The views we have expressed herein are in accordance with logic and common sense. If we adopted the rule contended for by defendant, a guilty man could employ counsel, surrender himself, and then freely and voluntarily, outside the presence of his counsel, without threats, force, duress, or promise of reward, make a full and complete confession of having committed a felony, and if he were the only one who knew the facts, it would be impossible to convict him of the crime he had committed.

**Sixth**: *That denial of the right to counsel prior to the commencement of judicial process is a denial of due process.*

This contention is devoid of merit. Section 987 of the Penal Code reads: "If the defendant appears for arraignment without counsel, he must be informed by the court that it is his right to have counsel before being arraigned, and must be asked if he desires the aid of counsel. If he desires and is unable to employ counsel, the court must assign counsel to defend him." In the present case the trial court complied with the foregoing provisions of the Penal Code.

**Seventh**: *That proof of collateral crimes under the guise of impeachment may constitute a miscarriage of justice.*

The foregoing contention is unsound. Defendant testified that he was in Korea "fighting for his country in March of 1951." It was defendant's testimony that he had gone to Korea in February 1951 and been wounded in action in Korea, and that he did not return to the States until January 21, 1952. On cross-examination defendant was asked if it were not a fact that in April 1951 he had been arrested by the Inglewood Police Department. Defendant denied the arrest. The prosecution established on rebuttal that defendant was arrested both on April 4, 1951, in Inglewood and on April 5, 1951, in Compton.

Apparently the sole purpose of defendant's testimony concerning his "fighting for his country" was to create a sympathetic background and understanding between himself and the jury. It appears from the transcript that defendant's trial counsel was attempting to utilize defendant's extensive military background in this manner. Under these circumstances it was reasonable that the prosecution be allowed to show a fact

totally incompatible with the picture defendant's counsel was attempting to draw. Instead of being in Korea as a wounded veteran, defendant was being booked in two jails in the United States as a suspected criminal.

It would seem that defendant's counsel was satisfied that he had invited such a line of cross-examination, for he did not object at the trial to the prosecutor's questions. Defendant may therefore not now for the first time, on appeal, raise objections to his cross-examination. (*People* v. *Lindsey*, 90 Cal.App.2d 558, 567 [16] [203 P.2d 572]; cf. *People* v. *Westek*, 31 Cal.2d 469, 476 [5] et seq. [190 P.2d 9].)

Eighth: *That there were five instances of the exclusion of material evidence on behalf of defendant.*

An examination of the record discloses that this contention is without merit. Even assuming that the evidence was improperly excluded, it was not prejudicial error, and under article VI, section 4½, of the Constitution any such error would have to be disregarded by this court.

Ninth: *That the trial court erred in sustaining an objection to a question asked Lieutenant Barton Keene on cross-examination as to whether defendant was permitted to make any telephone calls from the sheriff's substation at Victorville to his attorney or his mother after he had been returned to California.*

This contention is also untenable. The court sustained an objection to such a question, apparently on the ground that the form and order of the question were improper. However, the record shows that thereafter Lieutenant Keene, in response to questions of defendant's counsel, testified that defendant did not request permission to make a telephone call and that he (Lt. Keene) was not given a card of an attorney by the name of Gladys Root and asked by defendant to call her.

It is clear that defendant's counsel was able to develop whether or not Lieutenant Keene had knowledge of defendant's requests or attempts to make any telephone calls.

Tenth: *That an unauthorized person, Mrs. Betty Crouch, was permitted in the courtroom during the trial, in violation of an exclusionary order.*

This contention is not correct. Mrs. Crouch was called to the witness stand to testify as to statements she had taken in her capacity as a stenographer in the San Bernardino Sheriff's office, particularly with reference to statements taken from Sandra on Monday, September 21, 1959. She was asked to read the statement from her notes, because she was unable to

recall the questions from memory. At this time Lieutenant Keene was recalled for a few questions before Mrs. Crouch commenced to read her statement.

Mrs. Crouch was then recalled to the stand, and counsel for Sandra asked the witness questions on *voir dire* concerning the statements she had taken from Sandra.

Lieutenant Keene was again recalled for *voir dire* examination concerning the taking of statements from both defendant and Sandra at the re-enactment of the crime at Adelanto on the morning of September 21, 1959.

Lieutenant Keene began testifying at this point, and prosecutor Turner asked if Mrs. Crouch could remain in the room. Counsel for Sandra stated, "I have no objection to her remaining." Defendant's counsel, who was present, and the trial judge made no statements at all.

After counsel finished questioning Lieutenant Keene, Mrs. Crouch resumed the stand and read into the record the interrogation of Sandra. Mrs. Crouch was then cross-examined. The court then adjourned at 2:47 p. m. on Monday, April 11, 1960.

The next day the court convened at 10:05 a. m. Sheriff Frank Bland was called as a witness and proceeded to testify. The afternoon recess was taken, and the court reconvened in chambers for argument.

Sheriff Bland was recalled to the stand and testified to defendant's handwritten confession. After Sheriff Bland was excused, the prosecution recalled Mrs. Crouch. For the first time, defendant's trial counsel objected to her taking the stand, on the ground that she had been a spectator during that morning in violation of the exclusionary order. The trial judge overruled the objection.

Mrs. Crouch took the stand and proceeded to testify from a transcript concerning the statements of defendant and Sandra during the re-enactment of the crime on September 21, 1959. After the statement was read into evidence, counsel for defendant asked no questions on cross-examination.

Since a motion to exclude witnesses except the one testifying is within the discretion of the trial court (Code Civ. Proc., § 2043), it was within the discretion of the trial judge to permit Mrs. Crouch to remain in the courtroom as he did. (*People* v. *Persky,* 167 Cal.App.2d 134, 139 [4] [334 P.2d 219]; *People* v. *Alaniz,* 149 Cal.App.2d 560, 566 [3] [309 P.2d 71]; *People* v. *White,* 100 Cal.App.2d 836, 838 [1] [224 P.2d 868].)

It is likewise settled that a court reporter can properly testify despite the fact that he has been in court contrary to an exclusionary order. (*People* v. *Smith,* 36 Cal. 2d 444, 447 [3] [224 P.2d 719].) In the present case, as in *People* v. *Smith, supra,* Mrs. Crouch's testimony consisted of reading notes previously recorded by her. Therefore, there was no reason to exclude her from the courtroom, and defendant has not shown that he was prejudiced in any way by this procedure.

Eleventh: *That the jury was not properly instructed.*

This contention is without merit. Defendant, without much argument or citation of authority, urges that the trial court erred in giving some instructions and not giving others. An examination of the record and the instructions given indicates that the jury was fully and fairly instructed upon all the material issues presented to it and that no prejudicial error was committed by the trial judge in instructing the jury.

Twelfth: *That the district attorney committed prejudicial error in his argument to the jury on the penalty hearing.*

During the penalty hearing the district attorney argued the deterrent effect of the death penalty. Defendant alleges that under the holding in *People* v. *Love,* 56 Cal.2d 720 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809], a reversal should therefore be had as to the penalty hearing.

There is no merit to this contention. We have examined the argument of the district attorney as it appears in the record and have concluded that his discussion of the deterrent effect of the death penalty was only a minor part of his appeal to the jury for that penalty.

The reference to the deterrent effect of the death penalty was therefore not prejudicial (*People* v. *Lane,* 56 Cal.2d 773, 787 [16] [16 Cal.Rptr. 801, 366 P.2d 57], and under article VI, section 4½, of the Constitution must be disregarded.

The judgment is affirmed.

Schauer, J., Peters, J., White, J., and Dooling, J., concurred.

Gibson, C. J., concurred in the judgment.

TRAYNOR, J.—I concur in the judgment, but wish to set forth my reasons for concluding that defendant was not deprived of the right to counsel.

Defendant was arrested in Arizona on September 18, 1959. On that day, shortly after an alleged failure by the police to comply with his request for counsel, he made two statements in response to questioning. The first included damaging admissions and the second a confession. He made another confession on the following day, and the questions put to him and his answers were recorded by a court reporter. On September 21 defendant reenacted the crime for the police. On September 22 he was arraigned, and counsel was appointed for him. He voluntarily began a fourth confession on October 5, but did not complete and sign it until approximately 1 p. m. on October 6. Later that afternoon he and his wife made a joint confession. The grand jury had returned an indictment against him on October 6, shortly before he had completed the fourth confession. He contends that the last two confessions were inadmissible on the ground that since they were taken in the absence of counsel he was deprived of the right to counsel.

Defendant invokes the recent decisions of the New York Court of Appeals in *People* v. *Di Basi,* 7 N.Y.2d 544 [166 N.E.2d 825], and *People* v. *Waterman,* 9 N.Y.2d 561 [175 N.E.2d 445], which require the exclusion of admittedly voluntary post-indictment confessions on the sole ground that defendant's counsel was not present when defendant made his statements. (But see *State of Oregon* v. *Kristich,* 226 Ore. 240 [359 P.2d 1106, 1111], in which the Oregon Supreme Court expressly rejected the *Di Biasi* rule.) The New York Court of Appeals relied on the concurring opinions of four Justices of the United States Supreme Court in *Spano* v. *New York,* 360 U.S. 315, 324, 326 [79 S.Ct. 1202, 3 L.Ed.2d 1265]. Those opinions indicate that at least under some circumstances due process requires the exclusion of a post-indictment confession made when the defendant's counsel is not present. In an opinion by the Chief Justice the court reversed the conviction on another ground and expressly refused to decide the right to counsel issue. The Chief Justice, however, together with three of the concurring Justices in the *Spano* case, had joined in earlier dissenting opinions to state that a defendant has a right to counsel immediately after arrest and that denial of his request for a lawyer should result in exclusion of his confession. (*Crooker* v. *California,* 357 U.S. 433, 441 [78 S.Ct. 1287, 2 L.Ed.2d 1448] ; *Cicencia* v. *Lagay,* 357 U.S. 504, 511 [78 S.Ct. 1297, 2 L.Ed.2d 1523].)

The *Spano, Di Biasi* and *Waterman* cases must be considered in some detail, since they present some of the practical considerations relevant to the solution of the constitutional problem.

Defendant Spano was indicted for first degree murder. Although he had not then been taken into custody, he surrendered three days later in the company of his attorney, who cautioned him not to answer any questions. He underwent substantial interrogation and was denied his request to speak to his attorney. Thereafter he confessed. The United States Supreme Court reversed the judgment on the ground that the confession was involuntary, viewing absence of counsel as one of various factors relevant to voluntariness. In a concurring opinion Justice Douglas, joined by Justices Black and Brennan, stated that in a capital case, where the accused was formally charged and was questioned without compliance with his request for counsel's presence, his constitutional rights were violated as seriously as in *Chandler* v. *Fretag,* 348 U.S. 3 [75 S.Ct. 1, 99 L.Ed. 4], in which the trial court had denied a continuance to allow defendant to obtain counsel. Justice Stewart, joined by Justices Douglas and Brennan, emphasized the distinction between "questioning a suspect in the course of investigating an unsolved crime" and questioning a man who has formally been accused by indictment, stating, "the absence of counsel when this confession was elicited was alone enough to render it inadmissible under the Fourteenth Amendment. . . . Our Constitution guarantees the assistance of counsel to a man on trial for his life in an orderly courtroom, presided over by a judge, open to the public, and protected by all the procedural safeguards of the law. Surely a Constitution which promises that much can vouchsafe no less to the same man under midnight inquisition in the squad room of a police station."

In the capital case involving Di Biasi the defendant was likewise not taken into custody until after the indictment. He had been hiding for some six and a half years, but surrendered on the advice of his attorney. There was no showing, however, that he requested the attorney's presence before making his responses to interrogation. In summarizing the concurring opinions in *Spano* v. *New York* and applying them to the case, the New York Court of Appeals laid down the rule that "*after indictment the right of an accused to the assistance of an attorney is absolute* and that questioning him after indictment in the absence of his attorney is a violation of his

right to counsel." (166 N.E.2d at p. 828.) (Italics added.) The statements made by Di Biasi were therefore inadmissible, and the judgment was reversed.

This holding was extended in *People* v. *Waterman* to a non-capital case in which the accused had no counsel. The defendant was apprehended immediately after the crime and made two voluntary statements during interrogation after indictment. They were excluded because *"Waterman was without counsel at the time of the alleged confession. He was not asked . . . if he had retained or been assigned counsel.* The fact that defendant Waterman was without counsel at the time of the questioning, when he was known to the interrogator to be an accused, should not deprive him of the benefit of the principle announced in *People* v. *Di Biasi.* . . ." (208 N.Y.S. 2d at p. 598.) (Italics added.) The decision was affirmed and its reasoning approved by the Court of Appeals. (9 N.Y.2d 561 [175 N.E.2d 445].)

In the foregoing cases, the confessions were obtained during police interrogation after indictment. In the present case there was no interrogation during or immediately preceding the fourth confession and relatively little interrogation during the making of the joint confession. Under *People* v. *Di Biasi,* however, exclusion does not turn on the extent of the interrogation. After indictment a defendant is entitled to counsel's advice at any time he is talking to the authorities. The *Di Biasi* rule would therefore seem to require exclusion of Garner's fourth confession as well as the one made jointly with his wife.

*People* v. *Downs,* 8 N.Y.2d 860 [168 N.E.2d 710], would not compel a different conclusion. There was no opinion in the *Downs* case. As the New York Court of Appeals has noted, however, "The *Downs* decision turned on the special circumstances there present. Thus, Downs was explicitly advised that he was not required to make any statements and that he could consult an attorney; his first confession was actually volunteered before any questions were put to him; and at the trial he gave testimony on direct examination in his own defense, as forecast by his counsel in his opening to the jury, which was virtually identical with the statements he made to the authorities before trial." (*People* v. *Waterman,* 175 N.E.2d at pp. 448-449; see Rothblatt & Rothblatt, *Police Interrogation: The Right to Counsel and to Prompt Arraignment,* 27 Brooklyn L. Rev. 24, 55-57.)

The language in the New York cases and in the concurring opinions in *Spano* v. *New York* indicates a concern to strike a balance "between the competing interest of society in the protection of cherished individual rights, on the one hand, and in effective law enforcement and investigation of crime, on the other." (*People* v. *Waterman,* 175 N.E.2d at p. 447.) The balance was struck by attempting to draw a line between neutral inquiry by the police aimed at discovering the facts of the crime and interrogation of a person suspected of committing the crime. It is a formalistic assumption that indictment is the point when a defendant particularly needs the advice and protection of counsel.[1] Often a defendant is arrested under highly suspicious circumstances and from the time he is apprehended his guilt is a foregone conclusion in the minds of the police. Frequently too, suspicion falls upon him at some intermediate point before indictment. In some cases the evidence against the accused may be stronger at the moment of arrest than it may be in other cases when the indictment is returned. It is hardly realistic to assume that a defendant is less in need of counsel an hour before indictment than he is an hour after. If the neutral inquiry-suspicion distinction is to be read into the due process clause of the Fourteenth Amendment, it would be preferable to do so forthrightly as in the English Judge's Rules. (Set forth in Devlin, The Criminal Prosecution in England, 137.)

The Judge's Rules provide: "1) When a police officer is endeavoring to discover the author of a crime, there is no objection to his putting questions in respect thereof to any person or persons, whether suspected or not, from whom he thinks that useful information can be obtained.

"2) Whenever a police officer has made up his mind to charge a person with a crime, he should first caution such person before asking any questions or any further questions, as the case may be.

"3) Persons in custody should not be questioned without the usual caution being first administered."

A Home Office Circular of 1930 stated: "Rule 3 was never intended to authorize the questioning or cross-examination

---

[1]The distinction between formal accusation and preliminary investigation has also been used in other contexts to justify requiring or denying presence of counsel. (See e.g., *In re Groban,* 352 U.S. 330 [77 S.Ct. 510, 1 L.Ed.2d 376]; *Bowles* v. *Baer,* 142 F.2d 787; *United States* v. *Levine,* 127 F.Supp. 651; *Rights of Witnesses in Administrative Investigations,* 54 Harv.L.Rev. 1214; *cf. Hannah* v. *Larche,* 363 U.S. 420 [80 S.Ct. 1502, 1514-1520, 4 L.Ed.2d 1307].)

of a person in custody after he has been cautioned, on the subject of the crime for which he is in custody. . . ." Police departure from the Rules may in the discretion of the trial judge result in excluding the confession. (Devlin, op. cit. *supra*, at p. 42.) A decision to exclude depends on all the facts in the case. (See *Regina* v. *Bass* [1953] 1 Q.B. 680, 684; *Regina* v. *Straffen* [1952] 2 Q.B. 911, 914; *Rex* v. *Voisin* [1918] 1 K.B. 531, 538; *Regina* v. *Wattam,* 36 Crim. App. Rep. 72, 77; *Rex* v. *Grayson,* 16 Crim. App. Rep. 7, 8.) "[W]henever the evidence in the possession of the police has become sufficiently weighty to justify a charge, the charge is for this purpose treated as having been made and the suspect is thereafter treated as the accused." (Devlin, op. cit. *supra* at p. 35.) The police are held to an objective standard in determining when the evidence has become sufficient to justify a charge.[2] (*Id.* at p. 36.)

It is urged in support of the *Di Biasi* rule that once the indictment is brought, the trial has in effect begun. (See *People* v. *Waterman,* 175 N.E.2d at pp. 447-448.) It would be just as reasonable, however, to view the judicial process as beginning at some other time as after arrest or after arraignment.

In any event there are serious objections to reading into the Fourteenth Amendment the neutral inquiry-suspicion distinction. "It may seem strange [to the police] that they should be supposed not to ask questions of the one person who is central to the investigation." (Williams, *Questioning by the Police: Some Practical Considerations* [1960] Crim. L.Rev. 325, 340.) Although questioning may sometimes be an easy substitute for scientific police work, it is also often

---

[2] "In practice, what happens is this. The police officer in the witness box is given evidence of a statement made by the accused before caution. He comes to a part of it which counsel for the defense wishes to keep out if he can; if counsel thinks it an arguable point, he will object on the ground that before the incriminating part was reached, the accused ought to have been cautioned, for, he will say, by this stage surely the police officer must have made up his mind to charge the accused. Counsel for the defense is then allowed to cross-examine the police officer to establish, if he can, that there are good grounds for his objection, the officer's narrative of evidence being for this purpose interrupted. If the evidence which the police had up to this point was strong and clearly pointed to the accused, the officer will find it difficult to maintain under cross-examination that he had not yet made up his mind to charge the accused. In practice, the judge tends to make his own assessment of the evidence; and if he thinks it strong enough, he will not put much value on assertions by the police officer that he was still in doubt." (Devlin, op. cit. *supra* at pp. 35-36.)

essential to the solution of a crime and the conviction of the guilty. There may be no witnesses other than the accused, or the witnesses may be dead or unavailable. Thus, as Justice Frankfurter stated in *Culombe* v. *Connecticut,* 367 U.S. 568 [81 S.Ct. 1860, 6 L.Ed.2d 1037] : "Despite modern advances in the technology of crime detection, offenses frequently occur about which things cannot be made to speak. And where there cannot be found innocent human witnesses to such offenses, nothing remains—if police investigation is not to be balked before it has fairly begun—but to seek out possibly guilty witnesses and ask them questions, witnesses, that is, who are suspected of knowing something about the offense precisely because they are suspected of implication in it.

"The questions which these suspected witnesses are asked may serve to clear them. They may serve, directly or indirectly, to lead the police to other suspects than the persons questioned. Or they may become the means by which the persons questioned are themselves made to furnish proofs which will eventually send them to prison or death." (*Id.* at p. 1040 [6 L.Ed.2d ] ; See *Watts* v. *Indiana,* 338 U.S. 49, 57-62 [69 S.Ct. 1347, 93 L.Ed. 1801] (concurring opinion).) Although at one time English courts excluded confessions obtained in violation of the Rules, they apparently do not do so now, and police questioning has become quite common. "Perhaps the truth is that the Rules have been abandoned, by tacit consent, just because they are an unreasonable restriction upon the activities of the police in bringing criminals to book." (Williams, op. cit. *supra,* at p. 332; see Confessions and Police Detention, Hearings Before the Subcommittee on Constitutional Rights of the Committee on the Judiciary, Senate, 85th Cong., 2d Sess. 15 [Statement of Professor Harry Street, University of Manchester] ; *cf. Cicencia* v. *Lagay,* 357 U.S. 504, 509 [78 S.Ct. 1297, 2 L.Ed.2d 1523].) The Home Secretary's circular of 1930, quoted above, is a "dead letter." (Williams, op. cit. *supra,* at p. 330; see Barth, The Price of Liberty 64-65; see generally, *Regina* v. *Bass* [1953] 1 Q.B. 680, 684; *Regina* v. *Straffen* [1952] 2 Q.B. 911, 914.)

The perpetrator of a crime is normally the one who knows most about it, and his confession, voluntarily made, is often the best evidence of his guilt that can be obtained. (See *Commonwealth* v. *Dillon,* 4 Dall. (U.S.) 116, 117 [1 L.Ed. 765] ; *Commonwealth* v. *Agoston,* 364 Pa. 464 [72 A.2d 575, 583] ; *People* v. *Valletutti,* 297 N.Y. 226 [78 N.E.2d 485, 488] ; *Haley* v. *Ohio,* 332 U.S. 596, 614 [68 S.Ct. 302, 92 L.Ed. 224]

[dissenting opinion].) Only overwhelming social policies can justify the exclusion of such vital evidence. In the case of coerced confessions, the evidence may be unreliable; even if reliable, a free society cannot condone police methods that outrage the rights and dignity of a person whether they include physical brutality or psychological coercion. (See *Spano* v. *New York*, 360 U.S. 315, 320-321 [79 S.Ct. 1202, 3 L.Ed.2d 1265]; Maguire, Evidence of Guilt 109.) When a confession is voluntary, however, courts are reluctant to exclude it. "Interrogation *per se* is not, while violence *per se* is, an outlaw." (*Ashcraft* v. *Tennessee*, 322 U.S. 143, 160 [64 S.Ct. 921, 88 L.Ed. 1192] [dissenting opinion]; see *Lyons* v. *Oklahoma*, 322 U.S. 596, 601 [64 S.Ct. 1208, 88 L.Ed 1481]; *Lisenba* v. *California*, 314 U.S. 219, 239-241 [62 S.Ct. 280, 86 L.Ed. 166].)

As many commentators and courts have recognized, there is a "compulsion to confess" to crime. Wigmore states the point colorfully: "The nervous pressure of guilt is enormous; the load of the deed done is heavy; the fear of detection fills the consciousness; and when detection comes, the pressure is relieved; and the deep sense of relief makes confession a satisfaction. At that moment, he will tell all, and tell it truly. To forbid soliciting him, to seek to prevent this relief, is to fly in the face of human nature." (Wigmore on Evidence, 3d ed. § 851 at p. 319; see, e.g., *Commonwealth* v. *Agoston*, 364 Pa. 464 [72 A.2d 575, 581, 583].) A psychiatrist explains the phenomenon of confessions in terms of subconscious but overpowering guilt feelings and desire for punishment. "There is . . .an impulse growing more and more intense suddenly to cry out his secret in the street before all people, or in milder cases, to confide it at least to one person, to free himself from the terrible burden. The work of confession is thus that emotional process in which the social and psychological significance of the crime becomes preconscious and in which all powers that resist the compulsion to confess are conquered."[3] (Reik, The Compulsion to Confess, p. 267.)

---

[3]He continues: "The whole emotional expenditure in confession in many cases weighs only little compared with the work of confession, that painful performance in which something has to be overcome and as little as the punishment weighs compared with the suffering that originates in the superego. No earthly judgment will attain the strictness of the superego in many persons. Describing the work of confession in the expressions of ego-factors, it can be conceived of as the effort that succeeds in having the superego allow the ego the benefit of confession. The masochistic pleasure of suffering and of torture through the super-

So long as the methods used comply with due process standards, it is in the public interest for the police to encourage confessions and admissions during interrogation.[4] (See *Culombe* v. *Connecticut*, 367 U.S. 568 [81 S.Ct. 1860, 6 L.Ed. 2d 1037, 1040 n. 2, 1044 n. 17] ; *State* v. *Smith*, 32 N.J. 501, 534 [161 A.2d 520] ; *Commonwealth* v. *Agoston*, 364 Pa. 464 [72 A.2d 575, 581] ; *Haley* v. *Ohio*, 332 U.S. 596, 614 [68 S.Ct. 302, 92 L.Ed. 224] [dissenting opinion].)

It may be argued that if the *Di Biasi* rule is adopted, the police will still have time to interrogate and encourage confessions before an indictment is returned or an information filed. In some cases, however, as in *Spano* v. *New York* and in *People* v. *Di Biasi*, an indictment may be returned in advance of the defendant's apprehension. In such cases there could be no interrogation of the suspect at all, except in the presence of his attorney. Moreover, if the suspect is in custody before indictment, the police could easily frustrate the rule by delaying the indictment or the information. Thus, the rule would operate only occasionally and arbitrarily. Again, it is never certain when the suspect will be in the proper frame of mind to confess. The psychological struggle between a guilty person's conscious desire to protect himself and his subconscious guilt feelings may not be resolved in favor of confession until some time after the crime. (See Reik, *op. cit. supra* at p. 266.)

Concededly, a rule that the police allow counsel to be present during questioning of a person either after his arrest, as suggested in the dissenting opinion in *Crooker* v. *California* and *Cicencia* v. *Lagay, supra,* or after suspicion has focused upon him would greatly aid in protecting him from his own folly and from his ignorance of the law. (See Memorandum on the Detention of Arrested Persons and their Production Before a Committing Magistrate in Chaffee, Documents on Fundamental Human Rights, Pamphlet 2 (1951-1952), p. 541.) It would also discourage police mistreatment of persons in

---

ego, during the period in which the work of confession takes place, can easily be recognized afterwards. The work of confession itself affords a partial gratification of that masochistic need for punishment. Only in this way—through the preceding suffering—does it become understandable that the criminal, with little anxiety, awaits the real punishment after the confession.'' (*Id.* at p. 268.)

[4]Questioning suspects has been declared ''indispensable in law enforcement'' (*People* v. *Hall*, 413 Ill. 615, 624 [110 N.E.2d 249, 254], quoted in *Culombe* v. *Connecticut*, 6 L.Ed.2d at p. 1044). It is noteworthy that on retrial, when his voluntary admissions were excluded from evidence, Di Biasi was acquitted. (See New York World-Telegram and Sun, March 2, 1961, p. 13 col. 1; 61 Colum.L.Rev. 748 n. 32.)

custody. The attorney's function, however, would hardly be confined to preventing the third degree and explaining to the accused the legal significance of the questions posed. Rather, in the words of Mr. Justice Jackson, "To bring in a lawyer means a real peril to solution of the crime, because, under our adversary system, he deems that his sole duty is to protect his client—guilty or innocent—and that in such a capacity he owes no duty whatever to help society solve its crime problem. Under this conception of criminal procedure, any lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." (*Watts* v. *Indiana,* 338 U.S. at p. 59 [dissenting opinion]; *Commonwealth* v. *Agoston,* 364 Pa. 464 [72 A.2d 575, 583]; *State* v. *Bunk,* 4 N.J. 461, 470 [73 A.2d 249]; Williams, op. cit. supra at p. 344.)

Recognition of a defendant's right to consult with counsel at the pretrial stages of the criminal action does not signify that counsel must be present during interrogation. In California, a defendant is guaranteed the right to counsel (Pen. Code, § 686, subd. 2). Moreover, "after . . . arrest, any attorney . . . may at the request of the prisoner or any relative of such prisoner, visit the person so arrested." (Pen. Code, § 825.) Willful prevention of consultation with an attorney makes an officer guilty of a misdemeanor and liable in a civil action for damages. (*Ibid.*) Before arraignment, an impecunious defendant is entitled to appointment of assigned counsel or of a public defender. (Pen. Code, § 987; Gov. Code, §§ 27700-27711.) These code sections, designed to assure a defendant effective representation by counsel, do not preclude questioning him when his counsel is not present.

The indigent defendant poses another problem under the *Di Biasi* rule, particularly in jurisdictions that are less liberal than California in providing counsel at public expense. Giving an accused who has the means and foresight to retain an attorney (frequently the "professional criminal") a right to counsel's presence during interrogation, would widen the gulf between the rights of a person with and one without counsel. (*People* v. *Di Biasi,* 7 N.Y.2d 544, 552 [166 N.E.2d 825] [dissenting opinion]; see 36 N.Y.U.L. Rev. 737, 741-742.) A defendant who has obtained the advice of counsel would be less in need of the protection offered by the *Di Biasi* rule than would the indigent defendant. To avoid this discrimination the New York courts held that an indigent defendant must be provided counsel before a post-indictment interrogation can

take place. As yet, however, the United States Supreme Court has not made appointment of counsel an absolute constitutional requirement in noncapital cases even at trial. (See e.g., *Betts* v. *Brady*, 316 U.S. 455 [62 S.Ct. 1252, 86 L.Ed. 1595].) Until it does, it can hardly impose the *Di Biasi* rule as a constitutional requirement without creating additional discrimination against the indigent.

The right to counsel means that the defendant must be given effective assistance of counsel to prepare and present his defense. This court has zealously protected that right. (*In re Turrieta*, 54 Cal.2d 816, 821-822 [356 P.2d 681] ; *People* v. *Mattson*, 51 Cal.2d 777, 790 [336 P.2d 937] ; *In re Levi*, 39 Cal.2d 41, 46-47 [244 P.2d 403] ; *In re James*, 38 Cal.2d 302, 310-313 [240 P.2d 596], and cases cited.) It has insisted that counsel have adequate opportunity to prepare the defense (*In re Newbern*, 53 Cal.2d 786, 790 [350 P.2d 116] ; *Cornell* v. *Superior Court*, 52 Cal.2d 99, 102-103 [338 P.2d 447] ; *In re Ochse*, 38 Cal.2d 230, 231 [238 P.2d 561] ; *People* v. *Sarazzawski*, 27 Cal.2d 7, 17 [161 P.2d 934]), expanded the scope of criminal discovery (*People* v. *Estrada*, 54 Cal.2d 713, 716 [7 Cal.Rptr. 897, 355 P.2d 641] ; *Cash* v. *Superior Court*, 53 Cal.2d 72, 75 [346 P.2d 407] ; *Powell* v. *Superior Court*, 48 Cal.2d 704, 707-709 [312 P.2d 698] ; *People* v. *Riser*, 47 Cal.2d 566, 584, 588 [305 P.2d 1]), protected counsel from unjustified contempt citations (*Cooper* v. *Superior Court*, 55 Cal.2d 291, 302-303 [10 Cal.Rptr. 842, 359 P.2d 274] ; *Gallagher* v. *Municipal Court*, 31 Cal.2d 784, 795-797 [192 P.2d 905]), and precluded the prosecution from obstructing the securing and presenting of defense evidence. (*People* v. *Kiihoa*, 53 Cal.2d 748, 751-754 [349 P.2d 673] ; *People* v. *McShann*, 50 Cal.2d 802, 808 [330 P.2d 33] ; see *People* v. *Carter*, 48 Cal.2d 737, 747-748 [312 P.2d 665] ; *People* v. *Kidd*, 56 Cal.2d 759, 769-770 [16 Cal.Rptr. 793, 366 P.2d 49].) The right to counsel does not imply, however, that a defendant lawfully in custody must be insulated from the police. If the police abuse their right to interrogate, the remedy is to exclude the involuntary confessions or admissions produced. (*People* v. *Brommel*, 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845] ; *People* v. *Trout*, 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231] ; *People* v. *Atchley*, 53 Cal.2d 160, 170 [346 P.2d 764] ; *People* v. *Berve*, 51 Cal.2d 286, 292 [332 P.2d 97] ; *People* v. *Jones*, 24 Cal.2d 601, 608-611 [150 P.2d 801].)

Peters, J., and Dooling, J., concurred.